THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TYRONE THORNTON, Defendant-Appellant.

First District (5th Division)    No. 1—99—3356

Opinion filed August 16, 2002.

REID, J., dissenting.

Dennis A. Berkson & Associates, Ltd., of Chicago (Dennis A. Berkson, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Margaret

J. Campos, and Susan M. Caraher, Assistant State's Attorneys, of counsel), for the People.

JUSTICE QUINN delivered the opinion of the court:

Defendant Tyrone Thornton was charged, along with codefendant Melvin Scott, with six counts of aggravated kidnaping, one count of forcible detention (720 ILCS 5/10—4(A) (West 1996)), three counts of aggravated battery (720 ILCS 5/12—4—(a), 12—4(b)(8) (West 1996)), one count of aggravated unlawful restraint (720 5/10—3.1(a) (West 1996)) and one count of unlawful restraint (720 ILCS 5/10—3 (West 1996)).

Following a jury trial, Thornton was convicted of two counts of aggravated kidnaping (720 ILCS 5/10—2(a)(1), (a)(3) (West 1996)). He was sentenced to 10 years in prison. On appeal, defendant asserts that his convictions must be reversed because (1) he was prejudiced when one of the jurors was interviewed *in camera* during jury deliberations; (2) his constitutional rights were violated when the court interviewed a juror regarding her health and this interview took place in the presence of only the State and defense counsel; and (3) the evidence was insufficient to support his convictions. For the following reasons, we affirm.

At trial, James Fullilove (the victim) testified that on August 30, 1997, at around 7 p.m. he was sitting in the backseat of a car parked in front of 6224 S. Vernon in Chicago, Illinois. At approximately 7:15 p.m., he saw codefendant Scott pull up in his car and block the car in which he was sitting. Defendant Thornton then got out of Scott's car and opened the door of Fullilove's car and pulled Fullilove out of the car. After Fullilove was out of the car, Thornton started punching him in the face, and the victim and Thornton fought for about 5 or 10 minutes. The victim tried to run and defendant tripped him. Defendant then pulled the victim's overalls off and the victim was left wearing underwear, socks, and one shoe.

After that, codefendant got out of his car, walked over, put the victim in a "full Nelson," and walked the victim through a gangway that led to an alley. As Scott was doing that, Thornton drove Scott's car around through the alley. Scott then forced the victim into the backseat of the car. Thornton then began to drive while the victim, Scott, and another man, named Hickey, were in the backseat. During the car ride, Hickey held the victim's head down so that he could not see where he was going while Scott punched the victim and told him that he owed him money for drugs. Thornton stopped the car in front of an abandoned three-flat building on 48th Street and Michigan Avenue.

After the car stopped, Scott took the victim out of the car in a "full Nelson" and brought him up to the third-floor apartment of that abandoned building. Once inside, the victim saw six or seven other people in the apartment. Thornton then punched the victim in the face a couple of times and then the other men in the apartment started punching, kicking and beating the victim. The victim heard someone on the phone while he was still being beaten. Thornton and Scott were still in the apartment. After the phone call, Thornton and Scott left the apartment while the other men continued to beat the victim.

About 30 or 40 minutes after Scott brought the victim into the apartment, someone came inside and said the police had Scott outside. The other men then stopped beating the victim and brought him out into the hallway. One of the men then kicked the victim down three flights of stairs. When the victim landed at the bottom of the staircase, he got up and walked outside, where he saw Detectives Carlson and Golab. The victim then saw Scott inside a police car and told the detectives that Scott was one of the men who kidnaped him. The detectives took the victim to the hospital where he remained until the next day. The victim's face was fractured on the right side, he had a broken rib, and his "kidneys were messed up."

Chicago police officer Shayna Fitzpatrick testified that at about 7:30 p.m., she went to 6224 S. Vernon in response to a radio broadcast regarding a kidnaping in progress. When she arrived, she met with the victim's brothers, Samuel and Kenneth. After speaking with them, she went with the victim's brothers to the victim's house at 6223 S. King Drive. While inside the house, Samuel received a phone call. Officer Fitzpatrick talked with Samuel about the phone call and as a result of that conversation, she sent a flash message with details about the kidnaping over the radio.

Chicago police detective Marie Patrice Carlson testified that she was working with Detective Golab on the evening of August 30, 1997. After hearing the flash message that Officer Fitzpatrick sent over the radio, she and Detective Golab went to 6223 S. King Drive. Once there, Detective Carlson spoke with Officer Fitzpatrick and the victim's brother, Samuel. Samuel then got into the police car with Detective Carlson. Detective Carlson heard another message while inside the car that a car matching the description of codefendant's had been stopped at 527 E. 61st Street. In response to that message, Detective Carlson, Detective Golan and Samuel drove to that location. When they arrived, Thornton and Scott were sitting in the back of a police car.

Another police officer brought Scott over to Detective Carlson and Detective Golab's car while Samuel exited the car. Detective Golan

then read Scott his *Miranda* rights. Scott first denied knowing about the victim's kidnaping and then said he might know where the victim was. Scott then directed the detective to 48th Street and Michigan Avenue. Detective Golab stopped the car at the southwest corner and then Scott told Detective Carlson to call over a teenaged boy who was walking down the street. When the boy reached the car, codefendant told the boy to tell "them" that he was with the police. The boy then walked across the street and into the building where the victim was.

Detective Carlson testified that shortly thereafter the victim came out of the building, wearing only a pair of blue boxer shorts with a torn waistband, white socks, and one shoe. The victim had swelling and contusions on his face, his right eye was swollen shut, and the victim's whole body was shaking. Detective Golab went to help the victim while Detective Carlson was in the police car with Scott.

The victim then brought Detective Carlson, Detective Golab, and some other police officers up to the third-floor apartment where Thornton and Scott had brought him. Detective Carlson then called for an evidence technician who came and took photos of the apartment. After that, the detectives brought the victim down to the police car and they were going to take the victim to Area Two for an interview when the victim began to complain of pain in his ribs and lower back. The police took him to the hospital.

Assistant State's Attorney (ASA) James Navarre testified that on August 31, 1997, he met with defendant in an interview room in Area Two while Detective Golab was present. ASA Navarre told defendant that he was a prosecutor and a lawyer but he was not defendant's attorney. ASA Navarre advised defendant of his *Miranda* rights. Defendant said he understood and agreed to talk to ASA Navarre. After talking with ASA Navarre and Detective Golab for about a half hour, defendant agreed to give a handwritten statement.

Defendant said that he had known Scott for about 10 years. Defendant also said that he knew Fullilove, who had owed Scott $550 for a couple of months. Scott had been trying to get the money from the victim but every time the victim saw Scott, the victim would run.

On August 30, 1997, at around 7 p.m., defendant was riding in the front seat with Scott in Scott's car while a person named William was in the backseat. Scott told the defendant that they were going to drive by 62nd and Vernon to see if the victim was there so that Scott could collect the money the victim owed him. When they arrived, Thornton saw the victim out on the street with his brothers. Thornton said they first drove around the block and then he got out of the car and walked up and grabbed the victim so he could not run.

Thornton said that the victim looked at Scott and he could see the

fear in the victim's eyes. The victim then tried to run, so Thornton grabbed him, and they "started tussling with each other" as the victim tried to run. Defendant hit the victim in the right eye and the victim kicked defendant. Defendant held onto the victim's overalls, which came off, and as defendant pulled the victim's overalls, the victim's left shoe came off also.

Defendant said that Scott got out of the car and the victim told his brother to go get the money that the victim owed Scott. When the victim's brother went to get the money, Scott stayed with the victim. Defendant then got into Scott's car and drove around the block. When defendant came around the block, Scott had the victim in a "full Nelson." Defendant stayed in the front seat and William stayed in the backseat as Scott forced the victim into the back of the car.

Defendant then drove to 4839 S. Michigan Avenue while Scott was in the backseat and was asking the victim where his money was. When they arrived at 4839 S. Michigan Avenue, William, Scott and defendant took the victim to the third-floor apartment. Once inside, defendant hit the victim in the ribs. William then used Scott's phone to call the victim's brother about getting the money the victim owed Scott. Defendant heard William say that William was going to call back in five minutes. A couple of Scott's friends were also in the apartment.

After William got off the phone, defendant and Scott drove to 61st Street and King Drive to pick up the money from the victim's brother. The victim's brother was not there when they arrived so defendant used Scott's phone to call the victim's brother to see where he was with the money. Defendant said he dialed a phone number in the 312 area code twice to call the victim's brother but heard a busy signal each time. Defendant did not know that the area code he should have been dialing was 708. As defendant was walking back to Scott's car, the police came. The detectives then arrived and Scott went with them to show them where the victim was being kept until they got the money.

Defendant took the stand in his own defense. Defendant testified that he was with Scott on August 30, 1997. He saw the victim on the street and he and defendant began to fight. Eventually they stopped fighting, and the victim and Scott got into Scott's car, which defendant was driving. No one pushed the victim into the car. Defendant was told to drive to 48th Street and King Drive. On the way there, he heard Scott and the victim talking about money that the victim owed Scott. Upon arrival, Scott, the victim, and a third man got out of the car and went into a building. Defendant stayed in the car. After approximately 30 minutes, Scott returned to the car. Defendant asked for a ride home. Scott parked the car at 61st Street and King Drive

and police came "from everywhere." The police took defendant to Area Two.

Defendant testified that he was at Area Two for almost a full day before he was interviewed by an assistant State's Attorney. Defendant asked the police to be allowed to call his lawyer several times but they refused. When the assistant State's Attorney questioned the defendant, the defendant lied because he was afraid. Eventually, the assistant State's Attorney told defendant that nothing would come of this incident and he could go home if he signed a statement. Defendant testified that the assistant State's Attorney made up everything in the statement. Defendant admitted that he signed all seven pages of the written statement. The defense rested.

The jury found defendant guilty of two counts of aggravated kidnaping. Defendant's motion for new trial was denied. After a hearing in aggravation and mitigation, the trial court sentenced defendant to 10 years in prison on one count of aggravated kidnaping. This appeal followed.

## ANALYSIS

### Juror Separation

Defendant first argues that his convictions must be reversed because during jury deliberations, a juror who complained of being ill was brought to the judge's chambers. There, she was questioned by the court on the record in the presence of counsel for both sides but not in the presence of defendant. The record reflects that the following took place:

"THE COURT: Come on in.

THE JUROR: I don't know if it's something I ate.

THE COURT: The food here, that could be true. Which jury are you on?

THE JUROR: The Tyrone Thornton.

THE COURT: Thornton jury. You are on the jury on deliberating. Do you think that if we stopped deliberations at this time that you would be able to continue deliberating tomorrow?

THE JUROR: I don't know that's possible.

THE COURT: Do you feel like you could continue to deliberate now?

THE JUROR: Oh, God no. I have been getting real nauseous.

THE COURT: Does either attorney have any questions for [the juror]?

THE STATE: No.

THE COURT: You want to go back with your fellow jurors. We will be with you in a minute, okay?

THE JUROR: Thank you.

DEFENSE COUNSEL: Did he say that they have verdict?

THE COURT: He said one of the jurors knocked on the door.

DEFENSE COUNSEL: That was at the same time this woman is sitting here. You asked her if she could continue deliberating she said God no. Does she need a doctor? I am very worried about the unanimity of the verdict at this point in time.

THE COURT: Well, at this point in time we don't have a unanimous verdict.

DEFENSE COUNSEL: I wouldn't think so.

THE SHERIFF: They say they reached a verdict.

They were signing one of the forms.

THE STATE: Should we give them a few minutes?

THE COURT: Yes. The jury indicated they had reached a verdict. In conjunction based on what transpired in my chambers, I think that it would be prudent to bring them out and question them about the chronology of their reaching a verdict and then see what they have together.

DEFENSE COUNSEL: I agree judge."

Apparently, during the discussions with the ill juror regarding her medical status and possible ability to continue, unbeknownst to the trial court, the remaining jurors continued to deliberate, ultimately reaching a verdict. Once back in open court, the following exchange took place on the record:

"THE COURT: You may be seated. Mr. Foreman, has the jury reached verdicts in this case?

THE JURY FOREMAN: We have.

THE COURT: Would you give the verdict forms to the sheriff, please. Mr. Foreman, during the deliberations, one of the jurors, *** who is a member of this jury, knocked on the door and indicated to the sheriff that she wasn't feeling well. I then had her brought into my chambers with the attorneys. While we were speaking to her, the sheriff informed me that there was another knock on the door and someone indicating that the jury had reached a verdict, is that correct?

THE JURY FOREMAN: That's right.

THE COURT: Was [the ill juror] in the room when the jury reached a unanimous verdict?

THE JURY FOREMAN: We have received her at least implicit approval on the verdict. We had unanimously on the first verdict and we were—been working for an hour and a half or two on the second, and we had at least her implicit approval, and there were two other people who had not yet decided on the verdict, but she was not one of those two.

THE COURT: Okay.

THE JURY FOREMAN: So we assumed on their change we were okay to move forward with it, with the verdict.

THE COURT: When [the ill juror] came back into the room, did you verify that with her?

THE JURY FOREMAN: Yes.

THE COURT: [Defense Counsel], would you like to have the verdicts published and the jury polled?

DEFENSE COUNSEL: Yes, Ma'am.

THE COURT: Ask the Clerk to publish the verdicts. I don't want any reaction from the people in the gallery.

THE CLERK: 'We, the jury, find the defendant, Tyrone Thornton, guilty of aggravated kidnaping, great bodily harm. We, the jury, find the defendant, Tyrone Thornton, guilty of aggravated kidnaping with ransom.'

THE COURT: Ladies and gentleman, at this time the clerk is going to be asking each of you individually a question, and that is, 'were these then and are these now your verdicts?'

\* \* \*

DEFENSE COUNSEL: Your Honor, so the record is completely clear, could you inquire as to which one of the two was the one that was under discussion towards the end?

THE COURT: Which verdict?

DEFENSE COUNSEL: Yes, Ma'am.

THE COURT: Mr. Ingliss, could you answer that question?

THE JUROR: Great bodily harm.

THE COURT: Anything else?

DEFENSE COUNSEL: Could you perhaps ask the foreman what words were used in the jury room to affirm that verdict due to the absence of the one of the members of the jury when that verdict was apparently reached.

THE COURT: Could you repeat that please?

DEFENSE COUNSEL: Yes, Ma'am. Could you perhaps inquire of the jury what words were used to affirm the verdict that was apparently reached when one of the jury members on that one count, great bodily harm, was in your chambers.

THE COURT: I believe that infringes on the secretiveness of the jury deliberations and I will not ask that question.

DEFENSE COUNSEL: Thank you, judge."

Defendant's initial assertion of error based on these facts is that the separation of the ill juror from the jury during deliberations violated the applicable state statute.

■ Section 115—4 of the Illinois Code of Criminal Procedure of 1963 (725 ILCS 5/115—4 (West 1996)) reads, in relevant part, as follows:

"(l) When the jury retires to consider its verdict an officer of the court shall be appointed to keep them together and to prevent

conversation between the jurors and others; however, if any juror is deaf, the jury may be accompanied by and may communicate with a court-appointed interpreter during its deliberations. Upon agreement between the State and defendant or his counsel the jury may seal and deliver its verdict to the clerk of the court, separate, and then return such verdict in open court at its next session.

(m) In the trial of a capital or other offense, any juror who is a member of a panel or jury which has been impaneled and sworn as a panel or as a jury shall be permitted to separate from other such jurors during every period of adjournment to a later day, until final submissions of the cause to the jury for determination, except that no such separation shall be permitted in any trial after the court, upon motion by the defendant or the State or upon its own motion, finds a probability that prejudice to the defendant or to the State will result from such separation."

Defendant argues that the separation of the juror in the instant case caused prejudice to defendant. Defendant acknowledges that the standard of review as to the determination of whether a defendant has been prejudiced is left to the sound discretion of the trial court, based upon the facts and circumstances of each case and the nature of the action which is alleged to be prejudicial, citing *People v. Payton*, 84 Ill. App. 3d 181 (1980), and *People v. Martinez*, 45 Ill. App. 3d 939 (1977).

However, defendant urges us to hold that, to the extent that either section 115—4(*l*) or (m) is violated, and the jurors are separated during deliberations, a strict reading of the statute requires reversal of any conviction, *per se*. In support of this proposition, defendant relies upon the holding in *People v. Ritzert*, 17 Ill. App. 3d 791 (1974).

In *Ritzert*, the defendant was convicted of driving while intoxicated. After the jury had deliberated for four hours without reaching a verdict, the trial court asked counsel from both sides what they wished to do. Defense counsel preferred that a mistrial be declared and the prosecutor urged that the jury be allowed to go home and resume deliberations in the morning. The court sent the jury home. The following morning the defendant objected to the procedure but the trial court noted that no objections had been raised prior to the jury's release. The appellate court reversed the defendant's conviction and found that defendant's failure to object to the separation was of no consequence and that, under the statute, the parties could only agree to such a separation after the jury had concluded deliberations and sealed its verdict. *Ritzert*, 17 Ill. App. 3d at 795.

Defendant acknowledges that many courts have held that the separation of jurors during deliberations in violation of the statute does not, *per se*, require reversal, citing *People v. Dahlin*, 184 Ill. App. 3d 59 (1989), *People v. Dungy*, 122 Ill. App. 3d 314 (1984), *People v.*

*Jackson*, 105 Ill. App. 3d 750 (1982), and *People v. Martinez*, 45 Ill. App. 3d 939 (1977). *Dahlin* and *Jackson* specifically declined to follow *Ritzert*.

Defendant also acknowledges that in *People v. Hanson*, 31 Ill. 2d 31, 41-42 (1964), our supreme court held: "[W]here the separation [of the jury was] *** by inadvertence or carelessness of the jurors or of the officer, or of both, the verdict will not be set aside unless it is clearly shown the jurors were operated on in some way to the prejudice of the prisoner. [Citations.]"

This topic has also been the subject of legal commentary. "Where it appears that a separation of jurors after submission of a criminal case to the jury was with authority of the court and not in violation of a statute or rule, or in some instances, where the separation was of such temporary or trivial nature as not to reasonably suggest the likelihood of prejudice, or where the separation was for a necessary purpose, the defendant generally has the burden of proving reversible harm." 75B Am. Jur. 2d Trial § 1531 (1992), citing *Brown v. United States*, 69 App. D.C. 96, 99 F.2d 131 (1938), *cert. denied*, 305 U.S. 562, 83 L. Ed. 354, 59 S. Ct. 97 (1938).

Defendant argues that in the instant case he has shown he was prejudiced by the separation because deliberations continued in the absence of the ill juror and a verdict was reached while all 12 jurors were not together. Specifically, defendant argues, "It is obvious that when the juror claimed she was ill and left the jury room, the other jurors, especially the two who had not voted for guilty, got scared and thought that the deliberations would be prolonged due to the illness of the juror and immediately gave up their beliefs of not guilty and changed their vote to guilty."

This court rejected a similar argument in *People v. Harris*, 294 Ill. App. 3d 561 (1998). There, the trial court received several notes from a jury during its deliberations. After three hours of deliberation, the jury sent out a note saying it was hopelessly deadlocked 11 to 1 on the first degree murder charge. The trial court discussed the note with the defense and prosecutor and told the jury, "Continue your deliberations on that charge." 294 Ill. App. 3d at 567. Two hours later, the jury sent out their next note saying, "Your Honor: Our hopelessly hung jury has resulted in a jury member dangerously close to a diabetic/high blood pressure emergency." 294 Ill. App. 3d at 567. The record does not indicate whether the trial court advised the parties of this note, but six minutes after receiving it, the judge informed everyone he was sequestering the jury for the night. The jury returned a verdict of guilty on the murder charge the following morning. On appeal, defendant contended that "because of the court's failure to inquire

whether the jury member was feeling well enough to deliberate, the ill juror likely believed the deliberations would continue until a verdict was reached and was thus compelled to chose [*sic*] between his convictions and his health." *Harris*, 294 Ill. App. 3d at 568.

In the instant case, the trial court polled the jurors and questioned the foreperson regarding whether the ill juror was one of the two "holdouts" on the one charge of aggravated kidnaping the jurors had not yet agreed upon when she was brought to the judge and attorneys to explain her illness. The foreperson explained that she was not a holdout and had given her permission to continue deliberating and that the ill juror agreed to the verdicts when she returned to the jury room. Consequently, the case for affirmance is much stronger here than it was in *Harris*. Indeed, by questioning the juror about her illness, the trial court in the instant case was taking steps to guard against the concern raised by the defense in *Harris*.

The dissent opines that we are treating this matter as "being *de minimis* simply because the ultimate result might have been the same" (333 Ill. App. 3d at 655) and "[t]he majority seems to be of the opinion the constitution allows an ill juror to simply ratify the desired verdict *ex post facto*" (333 Ill. App. 3d at 654). The transcript of the polling of the jurors clearly indicates, prior to the juror becoming ill, all of the jurors had unanimously voted to convict defendant on the charge of aggravated kidnaping based upon kidnaping with a demand for ransom (720 ILCS 5/10—2(a)(1) (West 1996)). Further, the ill juror *had* voted to convict defendant on the charge of aggravated kidnaping based upon inflicting great bodily harm upon the victim (720 ILCS 5/10—2(a)(3) (West 1996)). While two other jurors had not voted to convict defendant on this second count when the juror became ill and was brought to the judge and attorneys to explain her condition, the ill juror returned to the jury room and spoke with the foreman prior to the jury being brought out. Consequently, contrary to the dissent's characterization, the ill juror did not "simply ratify the verdict *ex post facto*." 333 Ill. App. 3d at 654. The evidence in the record conclusively proves that the ill juror did concur in both guilty verdicts and her ratification of the verdict during the process of the polling of the jury was no different than that provided by the other 11 jurors. As to our treating this matter as being *de minimis*, this court allowed oral argument in this case and, in this extremely lengthy opinion, we cite nine Illinois Appellate Court cases, four Illinois Supreme Court cases, one case from another state, one federal district court case and a legal treatise in our discussion of this single issue.

In *People v. McDonald*, 168 Ill. 2d 420 (1995), our supreme court discussed how important it is to poll jurors.

"The purpose of polling a jury is to determine that a verdict accurately reflects each juror's vote as reached during deliberations and that the votes were not the result of force or coercion. (*People v. Cabrera* (1987), 116 Ill. 2d 474, 490; *Williams*, 97 Ill. 2d at 307.) When polling a jury, a trial court must not hinder a juror's expression of dissent. (*Cabrera*, 116 Ill. 2d at 490; *Williams*, 97 Ill. 2d at 307.) If a juror indicates some hesitancy or ambivalence in an answer, then the trial judge must determine the juror's present intent by affording the juror the opportunity to make an unambiguous reply as to the juror's present state of mind. (*People v. Kellogg* (1979), 77 Ill. 2d 524, 528.) The trial judge, in determining whether a juror has freely assented to the verdict, hears the response and additionally observes the juror's demeanor and tone of voice during the course of polling the jury. (*Cabrera*, 116 Ill. 2d at 490.) A trial court's determination regarding a juror's voluntariness of his assent to the verdict will not be set aside unless the trial court's conclusion is clearly unreasonable. *Cabrera*, 116 Ill. 2d at 490."
*People v. McDonald*, 168 Ill. 2d at 462-63.

Also, see *People v. Lee*, 303 Ill. App. 3d 356, 366 (1999), finding that the record did not support defendant's argument that a trial court's failure to respond to two notes from the jury indicating it was deadlocked coerced a verdict. *Lee* cited *People v. Chandler*, 110 A.D. 2d 970, 487 N.Y.S.2d 887 (1985), which held that because the defendant had objected to the trial court's absence during deliberations, the court was able to poll the jury to determine whether the verdict was tainted.

■ In the instant case, when the court was advised that a juror was ill, the court acted appropriately in notifying the attorneys for both parties and then conducting an *in camera* interview with the juror. In retrospect, the court should have advised the jurors to stop deliberating until the juror rejoined them after her interview. However, the record from the polling of the jurors indicates that this error was not prejudicial to this defendant in the way he suggests in his argument on appeal, nor is there any other basis upon which to find prejudice. Consequently, we find that while the trial court should have instructed the jury to cease deliberation in the absence of the ill juror, the absence of such an instruction did not prejudice defendant and we therefore reject his first argument on appeal.

## Constitutional Issue

■ Defendant next argues that his convictions must be reversed where he was not present when the trial court, the State and defendant's trial counsel interviewed the juror *in camera*. In support of this argument, defendant cites the well-established principle that a

criminal defendant has a constitutional right to a public trial and to appear in person and by counsel at all proceedings that involve substantial rights. *People v. Kliner*, 185 Ill. 2d 81 (1998); *People v. Harris*, 294 Ill. App. 3d 561 (1998). Jury deliberations are a critical stage of trial which involve substantial rights. *People v. Ross*, 303 Ill. App. 3d 966 (1999).

"A communication between the judge and the jury following the jury's retiring to deliberate, except one held in open court and in the defendant's presence, deprives the defendant of his constitutional rights. See *McDonald*, 168 Ill. 2d at 459; *Childs*, 159 Ill. 2d at 227. A jury verdict, however, will not be set aside where it is apparent that no harm or prejudice resulted from an *ex parte* communication. See *McDonald*, 168 Ill. 2d at 460; *Childs*, 159 Ill. 2d at 227-28. The State has the burden of proving that any error in the *ex parte* response is harmless beyond a reasonable doubt. See *McDonald*, 168 Ill. 2d at 460; *Childs*, 159 Ill. 2d at 228." *People v. Kliner*, 185 Ill. 2d at 162.

In the instant case, the trial court did notify the attorneys for both sides of the juror's illness and conducted an *in camera* interview with that juror on the record, in their presence. This is considerably different from the facts reviewed in the cases cited by defendant. In *Childs*, the trial court discussed notes from a jury during deliberations with the State but did not discuss them with the defendant or his counsel. In *McDonald*, the trial court informed the State and defendant's standby counsel of notes from a jury during deliberations but did not inform the defendant, who was trying the case *pro se*, until after giving the response. In *Kliner*, the trial court did not tell the defendant or his attorney of six written inquiries from a jury during deliberations before choosing to answer or choosing not to reply. The courts in *McDonald* and *Kliner* found the actions of the trial court to be error but that the improper communications were harmless beyond a reasonable doubt.

In *Harris*, a case relied upon by defendant, the trial court received a note from the jury's foreperson saying that one of the jurors was ill and they were "hopelessly hung." *Harris*, 294 Ill. App. 3d at 567. The trial court did not advise the defendant, his counsel, or the State of this communication or of another subsequent note. In finding this to be harmless error, the appellate court distinguished the holding in *Childs*. In *Childs*, the jury asked the trial court a legal question that was deserving of an answer. In *Harris*, the appellate court pointed out that the notes did not ask legal questions, indeed, they were not questions at all. Similarly, in the instant case, the *in camera* interview did not involve a legal question. It involved a determination as to whether an ill juror thought she was well enough to continue deliberating. The

reason that a defendant has a right to be present when there is a communication with a juror during deliberations is "so that he knows what is being done, can make objections and take such action as he deems best to secure his rights and for his protection and defense." *People v. Harris*, 294 Ill. App. 3d at 568, citing *People v. Childs*, 159 Ill. 2d 217 (1994). Considering the nature of the communication in the instant case, it is hard to see what action defendant could have taken. The court in *Kliner* similarly considered the nature of the communications between the jury and the judge in holding that they amounted to harmless error. *Kliner*, 185 Ill. 2d at 163-65.

For all of these reasons, we find that the trial court's failure to have the defendant present during the interview with the juror, while erroneous, caused him no prejudice and was therefore harmless beyond a reasonable doubt.

## Reasonable Doubt

■ Finally, defendant contends that the evidence presented at trial was insufficient to prove his guilt of aggravated kidnaping beyond a reasonable doubt. The issue of whether a defendant has been proven guilty beyond a reasonable doubt is resolved by viewing the evidence in the light most favorable to the prosecution. *People v. Hobley*, 159 Ill. 2d 272, 313 (1994). In reviewing the sufficiency of evidence, this court determines whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Mullen*, 313 Ill. App. 3d 718, 723-24 (2000). It is the function of the jury to assess the credibility of witnesses, weigh the evidence presented, resolve conflicts in the evidence, and draw reasonable inferences from the evidence. *People v. Williams*, 193 Ill. 2d 306, 338 (2000). The jury's determination is entitled to great deference, and when the sufficiency of the evidence is challenged, this court will not retry the defendant. *People v. Boclair*, 129 Ill. 2d 458, 474 (1989). The record in this case shows that the evidence against defendant was overwhelming. Consequently, we reject defendant's final claim of error.

For all of the above reasons, we affirm defendant's convictions and sentence.

Affirmed.

GREIMAN, J., concurs.

JUSTICE REID, dissenting:
I dissent. "An important goal of the criminal justice process is the protection of the innocent accused against an erroneous conviction."

*People v. Bull*, 185 Ill. 2d 179, 212 (1998). Many would argue it is the goal of the highest priority. *People v. Bull*, 185 Ill. 2d 179, 212 (1998), citing 1 W. LaFave & J. Israel, Criminal Procedure § 1.6(c), at 44 (1984). "The interest in the accuracy of a criminal proceeding that places an individual's life or liberty at risk is almost uniquely compelling. The many safeguards that the law has developed over the years to diminish the risk of erroneous conviction stand as a testament to this concern." *Bull*, 185 Ill. 2d at 212, citing *Ake v. Oklahoma*, 470 U.S. 68, 78, 84 L. Ed. 2d 53, 63, 105 S. Ct. 1087, 1093 (1985). "Whatever the number of safeguards in the system, the American criminal justice process is necessarily imperfect because it is operated by people and people are imperfect." *Bull*, 185 Ill. 2d at 212. In this case, there is no great conspiracy. In this case, an error was made that resulted in the separation of the ill juror from the rest *while deliberations continued unabated*. The majority believes that the trial court, once aware that an accidental error had taken place, adequately protected the sanctity of the judicial process by affirmatively polling the remaining jurors to ensure that any practical effect of the error was harmless. Respectfully, I must disagree with that conclusion.

The Illinois Constitution of 1970 guarantees the right to trial by jury. Ill. Const. 1970, art. I, § 13. With certain exceptions, none of which apply here, a trial by jury has been held to be a trial by a jury comprised of 12 jurors. *Hartgraves v. Don Cartage Co.*, 27 Ill. App. 3d 298, 301 (1975). Courts of this state have found that a criminal defendant's right to a 12-person jury is so fundamental that reviewing courts will invoke the plain error doctrine where appropriate to raise the issue on its own motion. The right to a 12-person jury is an essential feature of a substantial constitutional guarantee. *People v. Matthews*, 304 Ill. App. 3d 415, 419 (1999). Without consent of the parties, a verdict may not be properly rendered by a jury of any number other than 12. *Hartgraves*, 27 Ill. App. 3d at 301. In short, the jury system is a process, one worthy of our greatest care and protection.

In the case at bar, when the juror took ill, the final vote had not yet been taken and the jury deliberations continued in her absence until two holdouts caved in. That is the error in this case. Steps should have been taken to stop the jury deliberations. No such steps were taken and the deliberations continued unabated while the trial judge, understandably concerned about the welfare of the ill juror, questioned her back in chambers, outside the presence of her fellows, regarding her illness and whether she would be able to return to complete the deliberations. Once notified that the jury, with only 11 of the constitutionally mandated 12 jurors in harness, claimed to have

reached a verdict, the trial court expressed its concern about the effect of the separation on the process. The trial court stated:

"THE COURT: Yes. The jury indicated they had reached a verdict. In conjunction based on what transpired in my chambers, I think that it would be prudent to bring them out and question them about the chronology of their reaching a verdict and then see what they have together."

Once back before the jury, the trial court explained its understanding of the events that took place while the ill juror was separated from the rest. At that point the trial court participated in the following exchange:

"THE COURT: Would you give the verdict forms to the sheriff, please. Mr. Foreman, during the deliberations, one of the jurors, \*\*\* who is a member of this jury, knocked on the door and indicated to the sheriff that she wasn't feeling well. I then had her brought into my chambers with the attorneys. While we were speaking to her, the sheriff informed me that there was a another knock on the door and someone indicating that the jury had reached a verdict, is that correct?

THE JURY FOREMAN: That's right.

THE COURT: Was [the ill juror] in the room when the jury reached a unanimous verdict?

THE JURY FOREMAN: *We have received her at least implicit approval on the verdict.* We had unanimously on the first verdict and we were—been working for an hour and a half or two on the second, and we had at least her implicit approval, and there were *two other people who had not yet decided on the verdict,* but she was not one of those two." (Emphasis added.)

The constitutional rights of a defendant and the province of the jury itself are sacrosanct. The right of trial by jury is a fundamental right in the American judicial system. *Ney v. Yellow Cab Co.,* 2 Ill. 2d 74 (1954). As a fundamental right, like all the others we collectively hold so dear, it is due our most fervent protection. The reason is simple; a citizen's liberty hangs in the balance. And while it may be inconvenient for the trial court, both in terms of time and resources, to have to give a defendant a second trial, under these facts there would seem to be little alternative. The majority seems to be of the opinion the constitution allows an ill juror to simply ratify the desired verdict *ex post facto.* I cannot join in this viewpoint. The brilliance of the American jury system, and what makes it both the best system in the world and a shining example to other countries around the globe, is that it pits a predetermined number of ordinary citizens against each other, each armed with the trial court's instructions and their individual volumes of life experience. What follows, once the door to

the jury room is closed, is a process wherein each element comes into play. History has repeatedly shown us that one juror can make a difference, simply by persistence and the strength of his or her beliefs. I simply do not believe we should *ever* knowingly short circuit the process for purposes of expediency or convenience, not even if the properly constituted jury would have come to the same decision in the end. Here the record is clear; no provisions were made whereby a proper verdict could be rendered by less than the full complement of jurors. It is also equally clear that the ill juror's gastrointestinal distress occurred after the jury had begun deliberating in earnest, but before a final vote was taken. That is where the process had broken down. It is by the wisdom of the framers of our Constitution that, though we might guess or wish along certain lines, our system makes it impossible for us to say what would have happened in that jury room had this juror not taken ill during the deliberations. Whether she would have concurred in the ultimate verdict is, under these facts and unusual circumstances, largely irrelevant. We should not, since there are constitutional ramifications involved, disregard something as being *de minimis* simply because the ultimate result might have been the same. The jury process was interfered with in a way that impacts on Thornton's constitutional rights. As such, I stand alone on my belief that he should be tried again.