THIRD DIVISION
June 18, 2008

No. 1-06-1940

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 02 CR 10176 |
| | ) | |
| HAROLD PHILLIPS, | ) | The Honorable |
| | ) | Daniel P. Darcy, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE GREIMAN delivered the opinion of the court:

Following a jury trial, defendant Harold Phillips was convicted of first degree felony murder and aggravated arson and was sentenced to natural life and 30 years' imprisonment, respectively, the sentences to be served consecutively. On appeal, defendant advances numerous claims pertaining to his convictions and the sentences imposed thereon. Specifically, defendant contends: (1) his felony murder conviction must be vacated pursuant to the same-act doctrine because the same conduct formed the bases for the predicate felony and the felony murder charges; (2) trial counsel provided ineffective assistance when he failed to offer jury instructions on the lesser-included offense of criminal damage to property and failed to introduce, as substantive evidence, a report from state fire investigators concluding that the fire originated in a different location than the location determined by the supervising fire marshall; (3) the trial court erred in refusing to grant defense counsel's motion for a mistrial when one of the State's witness provided testimony that violated the court's prior ruling on a motion in limine; (4) the trial court violated defendant's constitutional right to be present at his trial when it permitted trial counsel to waive defendant's presence at a conference discussing the response to a question posed by the jury during jury deliberations; and (5) his conviction and consecutive sentence for aggravated

arson must be vacated because Illinois law does not permit the imposition of a separate conviction and sentence for the predicate offense of felony murder. We affirm in part and vacate in part.

In the early morning hours of March 22, 2002, a three-story residence became engulfed in flames and the fire resulted in the death of three children: Frankie Ramos, age 8, Erica Ramos, age 7, and Samantha Cruz, age 3. In a 23-count indictment, defendant was charged with various crimes in connection with the fatal fire including intentional and knowing murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2002)), aggravated arson (720 ILCS 5/20-1.1(a)(3) (West 2002)), residential arson (720 ILCS 5/20-1.2(a) (West 2002)), and first degree felony murder (720 ILCS 5/9-1(a)(3) (West 2002)) predicated on charges of aggravated and residential arson.

Prior to trial, defendant, through counsel, filed a motion in limine seeking to bar testimony that defendant had committed prior acts of arson, arguing that such testimony would be "extraordinarily prejudicial to the defendant." The State made no objection to defendant's motion. Accordingly, the trial court granted the motion and ordered both parties to admonish their trial witnesses not to reference prior fires.

In addition, the day before trial commenced, the State moved to nol-pros the intentional and knowing murder charges. Accordingly, it chose to proceed solely on the felony murder charges predicated on aggravated and residential arson.

At trial, Elzy Ramos testified that in March 2002, she lived on the second floor of a two-story residence located at 2442 West 25th Street with her mother, Trinidad, her sister Doris, her nephew Danny, and her three children: Frankie, Erica, and Samantha. Elzy's sister Gloria lived with her three children and her boyfriend on the first floor of the residence. On March 21, 2002,

1-06-1940

at approximately 9:30 p.m., Elzy put her three children to bed in the rear of their second-story residence. Thereafter, Elzy exited her residence at approximately 11:40 p.m., leaving her three children in the care of her mother and sister, who both remained home. Elzy returned to her house in the early morning hours of March 22, 2002, and "seen [sic] [her] house getting burned." She immediately asked her neighbor if her children had gotten out of the house safely and was told that they had been taken to the hospital. Elzy learned that her two daughters had been transported to Mount Sinai Hospital, while her son was taken to St. Anthony's Hospital. When Elzy arrived at Mount Sinai, she was informed that her youngest daughter, Samantha, had died; however, her daughter Erica was still alive and was receiving medical treatment. A detective then took Elzy to St. Anthony's, where she was informed that her son Frankie was also dead. Shortly thereafter, Elzy learned that Erica had also died as a result of the injuries she sustained in the fire.

Doris Ramos confirmed that in March 2002, she had been living with Elzy and Elzy's children at the 2442 West 25th Street residence, which she described as a brick building with a wooden enclosed porch that was affixed to the rear wall of the building. Doris further confirmed that on March 21, 2002, at approximately 11:30 p.m., Elzy instructed her to watch over her three children and left the residence. Doris fell asleep shortly thereafter in her bedroom located near the front of the house. She awoke later that night and smelled smoke. She looked out of her window and saw that the back of her house was engulfed in flames. She immediately informed her mother and her sister Gloria that the house was on fire and exited the residence. Once Doris exited the residence, she realized that Elzy's children were still in the house and informed the members of the fire department that there were children in the burning house. Doris denied that

3

gasoline had been stored in the house or on the porch at the time of the fire, but explained that her family did store kerosene on the top of the porch near the attic. Moreover, Doris testified that their garbage cans were not stored near the house; rather, their City of Chicago issued garbage cans were located in the alley.

Gloria Ramos testified that she went to sleep on March 21, 2002, at approximately 10 p.m., and was awakened when her sister Doris pounded on her door and told her the house was on fire. Gloria looked toward the back of the house and saw that "everything was on fire." Accordingly, Gloria, her live-in boyfriend, and her two daughters exited the residence. Shortly thereafter, her mother realized that Elzy's children were still in the house. Gloria then ran up the stairs but could not enter the residence to rescue her nieces and nephew because it was too hot and there was too much smoke. She informed a firefighter that there were children still in the house. He went up the stairs, but came back down and said he could not find them. Gloria confirmed that her family stored a five-gallon container of kerosene on the porch of their residence along with various kinds of paints. She also confirmed that the family did not store their garbage cans near their residence; rather, the garbage cans were stored in the alley.

Chicago firefighter Edward Negron responded to an alarm concerning the fire at 2442 West 25th Street on March 22, 2002, at approximately 2:45 a.m. When Negron arrived at the scene, he noted that it was "[v]ery windy" and "very cold" and that "a fire was going with heavy smoke." He and his team unfurled their hose and led it through the gangway located between the 2442 and 2440 buildings. They discovered "heavy flame *** from top to bottom" in the back of the building. Negron did not see anything burning except for the back porch. Notably, he did not see any garbage cans burning in the gangway. Several other fire companies arrived at the scene

4

and it took three or four hours to extinguish the blaze.

Chicago firefighter Richard Koffski was part of the second engine company to arrive at the fire on March 22, 2002. Upon his arrival, Koffski went to the rear of the building "where the body of the fire was." He noted that the entire back porch was ablaze. Koffski, however, did not observe any burning garbage cans near the residence. He assisted in the rescue of the three children, covering Firefighter Herrera as he passed the children out of the window.

Kenneth Herzlich, a freelance video journalist who provides overnight video footage to local television stations, testified that on March 22, 2002, at approximately 2:46 a.m., he was monitoring police and fire radio transmissions, when he heard a transmission about a fire at 2442 West 25th Street. Herzlich drove to that location and saw flames at the back of the residence. He then proceeded to shoot video footage of the fire from locations at the front of the house as well as in the backyard of a neighbor's house, which he then sold to the local television stations. Herzlich's video was published to the jury. In the 10-minute video, the fire is shown from different angles. The video also depicts the efforts by various firefighters to extinguish the blaze and shows firemen carrying two unconscious children from the fire. An attempt by one of the firefighter's to perform CPR on one of the victims is also shown.

Dr. Mitra Kelelkar, the assistant deputy chief medical examiner of Cook County, and a forensic pathology specialist, performed an autopsy on Erica Ramos. In performing the autopsy on Erica, she started with an external examination and noted that Erica had burn marks on her chest, abdomen, as well as her upper and lower extremities. Dr. Kelelkar also saw a number of signs of medical intervention. She then conducted an internal examination and discovered that Erica's respiratory system showed signs of congestion of the laryngeal mucosa, evidence of a

burn injury. Based on her findings, Dr. Kelelkar opined that Erica Ramos died after sustaining thermal injuries in a fire and that "[t]he manner of death was homicide."

Dr. Kelelkar also reviewed the autopsy reports of Samantha Cruz and Frankie Ramos. The external examination of Samantha Cruz revealed the presence of soot around Samantha's nose and mouth. Moreover, there were various areas of skin slippage where Samantha's skin had blistered. The internal examination revealed that Samantha had soot on her tongue and in her trachea, a finding that is "consistent with inhaling smoke from a fire." Toxicology tests were also performed on Samantha, the results of which showed that her blood tested positive for carbon monoxide at a level of 47%. Based on her review of the reports, Dr. Kelelkar opined that Samantha died "as a result of carbon monoxide intoxication as a result of a house fire" and that the manner of death was homicide.

The external examination of Frankie Ramos revealed that Frankie had soot deposits on his face and that the skin on his chest, abdomen, and left forearm showed signs of blistering. The internal examination revealed the presence of soot in the trachea and bronchi. Toxicology tests were also performed on Frankie and the results revealed that his blood tested positive for carbon monoxide at a level of 33%. Based on her review of the autopsy and toxicology reports performed on Frankie, Dr. Kelelkar opined that Frankie's death was the "result of carbon monoxide intoxication, because of inhalation of smoke and soot resulting from a house fire" and that the manner of death was homicide.

Pablo Alvarez testified that on March 22, 2002, he lived on the third floor of an apartment building located at 2448 West 24th Place, of which he was the landlord. Defendant and his roommate, David Bingenheimer, resided in the coach house located in the rear of the

6

property. At approximately 2 a.m., Alvarez was talking with a friend approximately 100 yards west of his residence, when he saw defendant, wearing a black leather jacket, exit the property and head in a westerly direction. Alvarez did not see anything in defendant's hands. Sometime thereafter, as Alvarez was entering his apartment building, defendant returned. Alvarez asked defendant where he had gone and defendant indicated that he had been walking, and they both went to their respective residences. Approximately 10 minutes later, Alvarez heard fire trucks, looked out, and saw flames in the direction in which defendant had returned from his walk. He became upset, went to defendant's residence, and asked defendant if he was responsible for the fire. The two engaged in a heated discussion, during which defendant stated: "I didn't do nothing but light a garbage can." Alvarez then told defendant to "Get the f--- out."

David Bingenheimer, defendant's former roommate and friend for over 20 years, testified that on May 21, 2002, at approximately 8 p.m., he and defendant were in the coach house drinking beer and watching movies with their friend Mario Sanchez. Bingenheimer also admitted that he had snorted cocaine sometime earlier that day. Sanchez left sometime after midnight and Bingenheimer took a shower. When he began walking around the coach house nude, defendant became upset and the two men had a physical confrontation. After their fight, defendant "stormed out" of their residence. Bingenheimer noted that as defendant left, he was carrying a container that resembled an antifreeze bottle; however, Bingenheimer did not know the exact contents of the bottle. Moreover, Bingenheimer conceded that the handwritten statement that he provided to investigators does not mention that he saw defendant remove a bottle from their residence. Defendant returned approximately 20 to 30 minutes later and informed Bingenheimer that he had lit a garbage can on fire using gasoline. Bingenheimer did

not think defendant's statement was significant and went to sleep.

Bingenheimer awoke when Pablo Alvarez came to the coach house later that night. After engaging in a discussion with Bingenheimer and defendant, Alvarez left. The next day, when Bingenheimer awoke, he noticed that defendant had left the apartment with his belongings. Bingenheimer then walked over to the scene of the fire and talked to two officers from the Chicago fire department's office of fire investigation, including Fire Marshall O'Toole. Bingenheimer informed O'Toole that he thought defendant had started the fire because "[t]here's been others in the past." He further informed O'Toole that defendant had left their apartment carrying an object and that, when he returned, defendant "said he lit a garbage can on fire." Thereafter, Bingenheimer conversed with Detective Timothy O'Meara from the Chicago police department's bomb and arson unit at the unit's headquarters.

Following their conversation, Bingenheimer and Detective O'Meara went to look for defendant. After unsuccessfully attempting to locate defendant at the houses of his relatives, they "spotted him on Cermak and Leavitt behind a laundromat" at approximately 6:30 p.m. as they were driving around the neighborhood in O'Meara's squad car. Detective O'Meara engaged in a conversation with defendant and defendant entered the squad car. Defendant and Bingenheimer then conversed in the backseat of the vehicle and defendant again admitted that he lit a garbage can on fire.

Detective O'Meara confirmed that he conversed with Bingenheimer on March 22, 2002, at approximately 3 p.m., and that based on the information provided by Bingenheimer, he attempted to locate defendant with Bingenheimer's assistance. After successfully locating defendant in the alley located at 2139 West Cermak Road at approximately 6:30 p.m., he

identified himself as a detective with the Chicago police department's bomb and arson unit, informed defendant of his rights, and put defendant in the backseat of the police car with Bingenheimer. Defendant and Bingenheimer conversed while Detective O'Meara drove the vehicle. He overheard defendant admit to Bingenheimer that he had set fire to a garbage can. Thereafter, Detective O'Meara drove back to the scene of the fire. He was joined by Detective Flynn, and together they asked defendant to retrace his steps and show them how he started the fire.

They started the reenactment at defendant's residence located at 2428 West 24th Place. Defendant then led Detectives Flynn and O'Meara westward and they crossed an embankment and some railroad tracks. They walked south along the tracks until they arrived at the residence located at 2442 West 25th Street. Defendant then led the men to the back of the residence and revealed that there had been garbage cans up against the north wall of the building, although there were no garbage cans present during the reenactment. Defendant explained that he opened one of the garbage cans and attempted to ignite the trash inside. He further revealed that he had trouble starting the fire because it was windy. Accordingly, defendant moved the garbage can to the east side of the building to shield it from the wind before using a lighter to ignite the fire. Once he lit the fire, defendant explained that the flames became large and that he became scared and ran away. Defendant never mentioned using gasoline or an accelerant to ignite the fire.

Following defendant's reenactment, Detective O'Meara took defendant to his office, where he called Area 4 violent crimes and spoke to Detective Swiderek. The next day, Detective O'Meara contacted the office of fire investigation to obtain additional manpower to help him locate the garbage can that defendant had said he had set on fire. After obtaining the necessary

manpower, Detective O'Meara and several members of the office of fire investigation, including Supervising Fire Marshall Timothy Corcoran, went to the scene of the fire and visually examined the debris. He explained that they were looking for evidence to corroborate defendant's confession. Specifically, they were looking for remnants of a garbage can. Detective O'Meara explained that "[t]hey melt, the plastic garbage can[s]. They melt down into a pancake. We always find that pancake." After sifting through the layers of debris, however, they were unable to find evidence of the melted garbage can. But, once they reached the bare ground, Detective O'Meara could smell "a very, very strong odor [that] smelled like gasoline." Accordingly, he took a sample of the soil, which he placed in a metal can and transported the can to the crime lab for analysis.

Supervising Fire Marshall Timothy Corcorcan confirmed that he met with Detective O'Meara at the scene of the fire on March 23, 2002, at approximately 9 a.m. Corcoran explained that once Detective O'Meara informed him that there was an individual in custody who admitted to starting a fire in a garbage can on the east side of the residence, his "first priority" was to find the remnants of a melted garbage can. Specifically, he was looking for a "flat piece of congealed metal, or plastic, with a metal axle in it." He found several garbage cans that were intact and broke an axel off one of the cans and used it to compare it to other pieces of metal recovered from the fire; however, he was unable to find a match.

Thereafter, Corcoran commenced a walk-through of the residence. The rear of the residence contained several feet of fire debris. Once they reached the bottom of the pile, he noticed "an overwhelming odor of something that was similar to that of gasoline. That was unmistakable." Corcoran confirmed that Detective O'Meara then recovered a soil sample.

10

Based upon his examination of the fire scene, Corcorcan opined that "this fire was the result of the splashing or pouring of ignitable liquid, with a smell that was similar to that of gasoline. The only logical ignition source is an open flame." His opinion was based on the soil sample as well as the burn patterns on the building; however, he conceded that the report he prepared on the fire made no mention of burn patterns. Corcorcan further opined that the fire was intentional, but acknowledged that no gasoline can or any other accelerant container was found at the scene. In response to questions as to his familiarity with a report completed by bomb and arson investigators concluding that the fire originated in the second-floor rear enclosed porch, Corcoran indicated that he was unfamiliar with that report and revealed that he did not agree with that conclusion.

William Tyrrell, a current retiree from the Illinois State Police crime laboratory, received the can containing the soil sample collected by Detective O'Meara on March 25, 2002. When he opened the can, Tyrrell noted an "[o]dor of gasoline." Thereafter, he conducted various tests and concluded that the soil sample tested positive for the presence of gasoline. Tyrrell also tested an article of clothing recovered at the fire scene and found that it tested positive for the presence of petroleum distillate.

Detective Greg Swiderek testified that on March 22, 2002, at approximately 8 p.m., he received an assignment to investigate the fire at 2442 West 25th Street. Accordingly, he arrived at the bomb and arson headquarters and met with Detectives O'Meara and Flynn and learned that they suspected defendant of starting the fire. Detective Swiderek arranged for both defendant and Bingenheimer to be transported to Area 4 headquarters and subsequently met with defendant in a private interview room. After introducing himself, he informed defendant of his Miranda

rights, and defendant agreed to talk with him about the fire.

Defendant explained that at approximately 8 p.m. on March 21, 2002, he began drinking and watching movies with his roommate David Bingenheimer and their friend Mario Sanchez. Sanchez left the coach house at approximately 1 a.m. on March 22, 2002, and Bingenheimer began "messing with him." The two men had a physical confrontation, after which defendant left the residence carrying a beer. Defendant informed Detective Swiderek that he walked west on 24th Place toward the train tracks and that he came upon the north alley of 25th Street, an area in which defendant was familiar because he had spent time partying there. Because he was mad at Bingenheimer, defendant wanted to burn a garbage can. He found a garbage can behind the 2442 West 25th Street building and dragged it closer to the rear of the building. He attempted to ignite a fire in the garbage can, but because it was windy, he was unsuccessful. Accordingly, defendant moved the garbage can once again until it was located between the 2442 and the 2440 buildings. At that point, defendant used a green cigarette lighter and ignited a piece of cardboard in the garbage can. Defendant further explained that once the fire "started going good," he became scared, retraced his footsteps and ran back to his residence.

On his way back to the coach house, defendant encountered his landlord, Pablo Alvarez, who asked defendant why he was running. Defendant then informed Alvarez that he had lit a garbage can on fire. Alvarez told defendant he was no longer welcome to live in the coach house and ordered him to pack his belongings and leave. Once he arrived at the coach house, defendant informed Bingenheimer that Alvarez had ordered him to leave and, shortly thereafter, Alvarez arrived to ensure that defendant was leaving. Once he gathered his clothes and left the residence, he began walking to his grandmother's residence, which was located nearby. On the way,

12

defendant saw several fire engines and smoke, which he believed stemmed from the fire he had ignited.

Following their conversation, Detective Swiderek contacted the Cook County State's Attorney's felony review unit, and Assistant State's Attorney (ASA) Michael O'Donnell arrived shortly thereafter. Swiderek was present when defendant engaged in a discussion with O'Donnell and when defendant memorialized his statement on videotape. At all times, defendant was cooperative and answered their questions. Moreover, defendant never mentioned using gasoline to ignite the fire during any of the conversations in which Detective Swiderek was present.

ASA Michael O'Donnell confirmed that he received a phone call on March 23, 2002, pertaining to investigations about a fire that had occurred the prior day. After receiving the call, O'Donnell relocated to Area 4, where he conversed with Detectives Swiderek and Soroghan and learned that defendant was suspected of igniting the fatal fire. He met with defendant in an interview room in Area 4 headquarters. O'Donnell introduced himself, informed defendant that he was an assistant State's Attorney, and advised defendant of his constitutional rights. After being informed of his rights, defendant indicated that he understood his rights and revealed that he wanted to speak with O'Donnell about the fire. They conversed for approximately 30 to 40 minutes, and at the conclusion of their preliminary conversation, O'Donnell provided defendant with several options with which to memorialize his statement. Defendant elected to provide a videotaped statement and signed a consent-to-videotape form.

In his videotaped statement, defendant provided an account of the fire that was consistent with his prior statements. Specifically, defendant stated that in the early morning hours of March

22, 2002, he had a physical confrontation with David Bingenheimer, after Bingenheimer initiated several homosexual advances toward him after a night of drinking. He left the coach house with a beer in his hand, made a right turn, and walked over the railroad tracks until he reached an empty lot near 2442 West 25th Street. There, he found two empty garbage cans. Because he was "frustrated" by his encounter with his roommate, defendant attempted to ignite the refuse inside one of the garbage cans with a cigarette lighter; however, because it was windy, his attempts were unsuccessful. Accordingly, defendant moved the garbage can to the space separating the 2442 residence from another residence, where it was less windy. Defendant explained that the garbage can was three feet away from the wall of the 2442 residence, a distance where he believed "it wouldn't catch anything." Defendant knew that people lived in the residence. He explained that he would exchange friendly greetings with one of the women and some of the children that lived there. Defendant then used his lighter to ignite a piece of cardboard inside the garbage can.

Defendant stated that the fire "wasn't meant for the houses." He started the fire because he was frustrated by his encounter with Bingenheimer and he "didn't want anything to do with houses getting burnt. It was an accident." Once the flames in the garbage can became bigger, defendant became scared and ran back to his residence. He did not call the police or the fire department. He did, however, encounter his landlord, and informed Alvarez that he had started a fire in a garbage can. Alvarez then ordered defendant to leave and defendant returned to the coach house and began to pack up his belongings. Alvarez came by shortly thereafter to ensure that defendant was leaving and told defendant that the fire was big and asked him whether he had burned a car or a garage rather than a garbage can. Defendant repeated that he had ignited a

garbage can. Defendant then left the coach house and spent the remainder of the night in the hallway of his grandmother's building, which was located nearby.

At the conclusion of the State's case-in-chief, defense counsel moved for a directed verdict, which the trial court denied. The State then moved to nol-pros the counts charging defendant with residential arson and felony murder predicated on residential arson, which the trial court allowed. Defense counsel presented no evidence and both parties rested. Thereafter, outside the presence of the jury, the parties submitted jury instructions for the trial court to review. Defense counsel requested that the jury be provided with an instruction on the offense of involuntary manslaughter, arguing that there was evidence to support the conclusion that defendant acted recklessly and that his reckless acts unintentionally caused the deaths of the three children. Specifically, counsel argued:

> "[The State] presented evidence that Mr. Phillips lit a fire in a garbage can close to a house. And which we would argue is a reckless act on a windy day, lighting a fire in a garbage can close to a wood and asphalt shingled house. That's a reckless act and the jury could readily believe that because of that reckless act, that house caught fire and the children died."

The State, however, objected to defendant's request for an involuntary manslaughter instruction, arguing that the instruction was "not available" to defendant because involuntary manslaughter is not a lesser-included offense of felony murder. The trial court agreed with the State and declined to instruct the jury on the offense of involuntary manslaughter. Defense counsel also requested an instruction on the offense of reckless conduct; however, the trial court declined to provide that instruction as well.

Thereafter, the parties proceeded with closing arguments. The State emphasized that defendant repeatedly admitted his involvement with the fire, but argued that defendant attempted to minimize his culpability by claiming that he started the fire in a garbage can on the east side of the residence, rather than with gasoline on the west side of the residence. The State argued "[t]he physical evidence in this case is contrary to what defendant said," noting that the remains of a melted garbage can were not found, and that the burn patterns and the gasoline soil sample revealed that the fire originated on the west side of the residence, rather than on the east side of the residence. According to the State, the physical evidence showed that the "house was burned down by gasoline" and that defendant acted intentionally. Based on the evidence, the State argued that defendant should be convicted of felony murder predicated on aggravated arson.

Defense counsel, however, argued that there was no credible evidence that defendant knowingly ignited the residence with gasoline, noting that no gasoline container was ever found and that neither Pablo Alvarez nor David Bingenheimer ever mentioned that defendant smelled like gasoline on the night of the fire. Instead, counsel emphasized that defendant consistently stated on six different occasions that he started a fire in a garbage can. Accordingly, counsel argued that there was no evidence that defendant knowingly started the residence on fire and that the State failed to prove that defendant was guilty of felony murder predicated on aggravated arson.

At the conclusion of the closing arguments, the jury received the relevant jury instructions, including instructions on felony murder. Approximately one hour after jury deliberations commenced, the presiding judge received a note from the jury inquiring into the meaning of the term "knowingly." Specifically, the note stated: "This is our question:

16

Knowingly damage, partially or totally any building, is knowingly meant to be one, having knowledge of, two, or with intent. Or, to dispute unknowingly." The court informed the attorneys for both parties about the jury's question and asked defense counsel if he "waive[d] [defendant's] appearance" and counsel responded, "Yes." In response to the jury's question, the State argued that "the language of knowledge is pretty plain. At this point, they don't need any other direction and they should keep on deliberating." Defense counsel, however, requested the court to provide the jurors with Illinois Pattern Jury Instruction, Criminal, No. 5.01B (4th ed. 2000), subparagraph 2, which states: " 'Person acts knowingly with regard to the result of his conduct when he is consciously aware that such result is practically certain to be caused by his conduct.' " The court agreed with defense counsel that further instruction would assist the jury and ordered that the jury receive the instruction requested by defense counsel.

After receiving the additional instruction, the jury found defendant guilty of aggravated arson and first degree felony murder. Thereafter, the trial court, after finding defendant eligible for the death penalty based on the number and ages of the victims, presided over defendant's sentencing hearing. After hearing the arguments advanced in aggravation and mitigation, the trial court declined to impose the death penalty. Rather, the trial court imposed a natural life sentence for his first degree murder conviction and a 30-year sentence for the aggravated arson conviction and ordered the sentences to be served consecutively. Defendant responded with a motion to reconsider his sentence, which the trial court denied. Thereafter, defendant filed a timely notice of appeal.

On appeal, defendant first asserts that Illinois courts implicitly follow the same-act doctrine in reviewing felony murder convictions and that, pursuant to this doctrine, his felony

murder conviction must be vacated because the fire and the death of the children arose out of the same physical act. The State responds that the same-act doctrine does not apply and that Illinois precedent supports defendant's conviction for felony murder based on the predicate offense of aggravated arson.

The issue of whether a legal doctrine applies in a specific case presents a question of law, which is subject to de novo review. See Heastie v. Roberts, 226 Ill. 2d 515, 530-31 (2007).

A person commits the offense of felony murder when he, without lawful justification, causes a person's death while "he is attempting or committing a forcible felony other than second degree murder." 720 ILCS 5/9-1(a)(3) (West 2002). Aggravated arson is a forcible felony and, accordingly, can serve as the predicate offense for felony murder. 720 ILCS 5/2-8 (West 2002) (" 'Forcible felony' means *** aggravated arson"); see also People v. Hobley, 159 Ill. 2d 272 (1994) (upholding a defendant's felony murder conviction predicated on aggravated arson); People v. Washington, 272 Ill. App. 3d 913 (1995) (same). The ultimate purpose of the felony murder doctrine "is to limit the violence that accompanies the commission of forcible felonies, so that anyone who commits such a violent felony will be automatically subject to a murder charge if someone is killed during the commission of that felony." People v. Figueroa, No. 1-05-2805, slip op. at 8 (March 28, 2008), citing People v. Belk, 203 Ill. 2d 187, 192 (2003).

Felony murder differs from other forms of first degree murder in that the State is not required to provide evidence of the defendant's mental state at the time of the offense. Cf. 720 ILCS 5/9-1(a)(1) (West 2002) (intentional murder); 720 ILCS 5/9-1(a)(2) (West 2002) (knowing murder). Because of this fact, concern arose that the State would use felony murder charges to avoid the burden of proving intentional or knowing killings to obtain a first degree murder

18

conviction and would effectively eliminate second degree murder charges, a concern that was especially paramount in cases where the same evidence is used to prove the predicate felony and the killing. See People v. Morgan, 197 Ill. 2d 404, 430 (2001).

Our supreme court addressed this concern in People v. Morgan. In Morgan, the 14-year-old defendant, in response to being struck by his grandfather for receiving a detention at school, retrieved his grandfather's handgun and shot his grandfather. The defendant then shot his grandmother as she attempted to exit the residence. The defendant was charged with multiple counts of murder, including felony murder predicated on aggravated battery and aggravated discharge of a firearm. At his jury trial, the jury received instructions on felony murder. In analyzing the propriety of the instruction, the supreme court noted:

"The forcible felonies underlying the charges of felony murder in this case–aggravated battery and aggravated discharge of a firearm–were acts that were inherent in, and arose out of, the fatal shootings of [defendant's grandparents]. It is arguable that it was not the predicate felonies that resulted in and caused the murders of [defendant's grandparents], but rather that it was the murders of [defendant's grandparents] which gave rise to the predicate felonies." Morgan, 197 Ill. 2d at 447.

The court held that "where the acts constituting forcible felonies arise from and are inherent in the act of murder itself, those acts cannot serve as predicate felonies for a charge of felony murder." Morgan, 197 Ill. 2d at 447. Accordingly, because the predicate felonies arose from and were inherent in the murder of the defendant's grandparents, the court found that the trial court erred in instructing the jury on felony murder. Morgan, 197 Ill. 2d at 447-48.

The court next addressed the felony murder doctrine in People v. Pelt, 207 Ill. 2d 434

19

(2003). In <u>Pelt</u>, the defendant was convicted of aggravated battery of his 95-day-old son and felony murder predicated on aggravated battery of a child, based on evidence presented at trial showing that the defendant threw his son against a dresser and caused injuries that resulted in the infant's death. Defendant challenged his conviction, arguing his felony murder conviction was improperly predicated on aggravated battery, because, as in <u>Morgan</u>, the act constituting the forcible felony was inherent in the killing itself. <u>Pelt</u>, 207 Ill. 2d at 436-41. Our supreme court agreed, finding:

> "The act of throwing the infant forms the basis of defendant's aggravated battery conviction, but it is also the same act underlying the killing. Therefore, as in <u>Morgan</u>, it is difficult to conclude that the predicate felony underlying the charge of felony murder involved conduct with a felonious purpose other than the conduct which killed the infant." <u>Pelt</u>, 207 Ill. 2d at 442.

Accordingly, the court held that the aggravated battery charge could not serve as the predicate felony to felony murder and reversed the defendant's felony murder conviction. <u>Pelt</u>, 207 Ill. 2d at 442-43.

The supreme court provided its most recent comprehensive analysis of the felony murder doctrine in <u>People v. Davis</u>, 213 Ill. 2d 459 (2004). In <u>Davis</u>, the defendant was convicted of felony murder predicated upon mob action, based on evidence presented at trial that the defendant joined a group of 10 or more men and inflicted blows upon the victim, a stranger to their neighborhood, who died as a result of the beating he received. Defendant had admitted that he struck the victim several times, but stated that " '[he] did not mean for the guy to die.' " <u>Davis</u>, 213 Ill. 2d at 467. The defendant challenged his conviction, arguing, in pertinent part,

that his conviction for felony murder could not stand pursuant to the reasoning in <u>Morgan</u> and <u>Pelt</u>.

In rejecting the defendant's claim, our supreme court reaffirmed its prior holdings in <u>Morgan</u> and <u>Pelt</u>, confirming that when " 'the acts constituting forcible felonies arise from and are inherent in the act of murder itself, those acts cannot serve as predicate felonies for a charge of felony murder.' " <u>Davis</u>, 213 Ill. 2d at 472, quoting <u>Morgan</u>, 197 Ill. 2d at 447. The court then found the facts in <u>Morgan</u> and <u>Pelt</u> distinguishable from those present in the case at hand, noting:

> "[T]o convict defendant of mob action, it was not necessary to prove that defendant struck [the victim], much less performed the act that caused the killing. Unlike <u>Morgan</u> and <u>Pelt</u>, we are able to conclude that the predicate felony underlying the charge of felony murder involved conduct with a felonious purpose other than the conduct which killed [the victim]. Therefore, under the facts of the instant case, mob action was a proper predicate felony for felony murder." <u>Davis</u>, 213 Ill. 2d at 474-75.

Accordingly, the court upheld the defendant's felony murder conviction.

Although the decisions in <u>Morgan</u>, <u>Pelt</u>, and <u>Davis</u> neither explicitly reference nor apply the same-act doctrine, defendant, relying on Justice Garman's special concurrence in <u>Davis</u>, contends that Illinois courts implicitly follow the same-act doctrine. <u>Davis</u>, 213 Ill. 2d at 480-97 (Garman, J., specially concurring). In her concurrence, Justice Garman provided a brief overview of various approaches taken by different jurisdictions to determine the propriety of felony murder convictions. Specifically, she identified the merger doctrine, where "a felonious assault can never serve as the basis of a charge of felony murder"; the same-act doctrine, which precludes felony murder "whenever the act that constitutes the predicate felony is the same act

21

that results in the death of the victim," and is thus an expansion of the merger doctrine "to any predicate felony, whether or not it involves assaultive conduct"; and the collateral-felony doctrine, which "requires that the predicate felony not be a lesser-included offense of second degree murder." Davis, 213 Ill. 2d at 483, 488-89 (Garman, J., specially concurring). Thereafter, Justice Garman noted that the Illinois Supreme Court had never expressly adopted the merger, same-act, or collateral-felony doctrines, and, in fact, had expressly rejected the merger and same-act doctrines in People v. Viser, 62 Ill. 2d 568 (1975). Davis, 213 Ill. 2d at 490 (Garman, J., specially concurring). Justice Garman, however, indicated her concern that the supreme court had implicitly adopted the same-act doctrine, despite reaffirming its prior decision in Viser, based on the language in Morgan requiring that " 'the predicate felony underlying a charge of felony murder must involve *conduct with a felonious purpose* other than the killing itself.' " (Emphasis in original.) Davis, 213 Ill. 2d at 490-91 (Garman, J., specially concurring), quoting People v. Morgan, 307 Ill. App. 3d 707, 714 (1999). Although Justice Garman expressed dissatisfaction with the same-act doctrine due to the fact that it ignored the legislative intent of the felony murder statute, she suggested that if the court were to adopt the same-act doctrine, "it should do so unequivocally and thereby give clear guidance to prosecutors and trial courts." Davis, 213 Ill. 2d at 495 (Garman, J., specially concurring).

Ultimately, we find that Justice Garman's special concurrence does not provide us with a reason to vacate defendant's felony murder conviction. Pursuant to the reasoning in Morgan, Pelt, and Davis, the relevant inquiry is not the number of acts committed by defendant but, rather, whether the predicate felony underlying the felony murder charge was inherent in the killing and involved conduct with a felonious purpose other than the conduct that resulted in the killing.

22

1-06-1940

Morgan, 197 Ill. 2d at 447-48; Pelt, 207 Ill. 2d at 442-43; Davis, 213 Ill. 2d at 474; see also People v. Figueroa, No. 1-05-2805, slip op. at 10 (March 28, 2008) (concluding that pursuant to the supreme court's holdings in Morgan, Pelt, and Davis, the relevant inquiry is whether the predicate felony was inherent in the killing such that it "involved conduct with a felonious purpose *other* than killing" (emphasis in original)); People v. Boyd, 356 Ill. App. 3d 254, 257-61 (2005) (same). Indeed, in Davis, the court affirmed the defendant's conviction for felony murder even though he only committed one criminal act, a result that would have been inconsistent with a literal application of the same-act doctrine. See Davis, 213 Ill. 2d at 494 (Garman, J., specially concurring) (recognizing that in Davis, the court was "faced with a case in which the defendant committed only one criminal act yet we are affirming his conviction for felony murder").

Applying the reasoning of Morgan, Pelt, and Davis, we conclude that defendant's conduct in starting the fire was not an act that was inherent in and arose out of the murder of Samantha Cruz, Erica Ramos, and Frankie Ramos, because it involved conduct with a felonious purpose other than killing the three children. Indeed, in his videotaped confession, defendant admitted that he started the fire because he was frustrated by his recent unpleasant encounter with his roommate, not because he intended to kill any of the residents of the home. "When the intent is to kill, there is no predicate felony; it is only when there is no intent to kill that a predicate felony is possible." Boyd, 356 Ill. App. 3d at 259 (upholding the defendant's conviction for felony murder predicated on aggravated discharge of a firearm, because the evidence showed that the defendant shot his firearm in an attempt to scare his brother, and that he did not intend to kill the victim). Because defendant did not intend to kill the victims when he set the fire, the predicate offense of aggravated arson was not an act inherent in the killings. Accordingly, we uphold

23

defendant's conviction for felony murder.

Next, defendant contends that his convictions must be reversed because he was denied his constitutional right to receive effective assistance of counsel when his trial counsel failed to request a jury instruction on the lesser-included offense of criminal damage to property where there was some evidence in the record to support such an instruction. The State argues that an instruction on the lesser-included offense of criminal damage to property was not warranted because there was no rational basis upon which the jury could have convicted him of the lesser offense and acquitted him of aggravated arson, and, accordingly, trial counsel was not ineffective for failing to request such an instruction.

A criminal defendant has a constitutional right to receive effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, §8. To establish a violation of his constitutional right to effective assistance of counsel a defendant must meet the two-pronged test established by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 687, 694, 80 L. Ed. 2d 674, 693, 698, 104 S. Ct. 2052, 2064, 2068 (1984), and show that (1) counsel's performance was objectively unreasonable and (2) resulted in prejudice to him. Strickland, 466 U.S. at 687, 694, 80 L. Ed. 2d at 693, 698, 104 S. Ct. at 2064, 2068; People v. Albanese, 104 Ill. 2d 504, 525-26 (1984). It is incumbent upon a defendant to satisfy both prongs of the Strickland test. Strickland, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064; People v. Patterson, 217 Ill. 2d 407, 438 (2005). To satisfy the first prong, the defendant must overcome the "strong presumption" that counsel's performance was a matter of sound trial strategy. Strickland, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065; People v. Perry, 224 Ill. 2d 312, 341-42 (2007). Moreover, to satisfy the prejudice prong, the defendant must prove that a reasonable

probability exists that, but for counsel's unreasonable performance, the trial result would have been different. Strickland, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068; People v. Cunningham, 376 Ill. App. 3d 298, 301 (2007).

Generally, a defendant may not be convicted of an offense for which he has not been charged; however, in certain cases a defendant may be entitled to proffer an instruction on an uncharged lesser-included offense to the jury. People v. Ceja, 204 Ill. 2d 332, 359 (2003). A lesser-included offense is one that "[i]s established by proof of the same or less than all of the facts or a less culpable mental state (or both), than that which is required to establish the commission of the offense charged." 720 ILCS 5/2-9(a) (West 2002). Courts employ the two-tiered charging instrument approach to determine whether an offense is properly considered a lesser-included offense and whether a defendant is entitled to a lesser-included offense instruction. People v. Kolton, 219 Ill. 2d 353, 359-60 (2006); People v. Echols, No. 1-05-3293 (April 22, 2008). Pursuant to this approach, an offense is a lesser-included offense of a charged offense if the factual description of the charged offense in the indictment contains a " 'broad foundation' " or " 'main outline' " of the lesser offense. Kolton, 219 Ill. 2d at 364, quoting People v. Jones, 207 Ill. 2d 122, 143-44 (2003) (Fitzgerald, J., specially concurring). However, " '[t]he identification of a lesser included offense does not automatically give rise to a correlative right to have the jury instructed on the lesser offense. [Citation.]' " People v. Baldwin, 199 Ill. 2d 1, 13 (2002), quoting People v. Novak, 163 Ill. 2d 93, 107-08 (1994). Accordingly, once a lesser-included offense is identified, the court must examine the evidence adduced at trial to determine whether the evidence rationally supports a conviction for the lesser-included offense in order to determine whether the defendant is entitled to an instruction on the lesser offense.

25

1-06-1940

People v. Medina, 221 Ill. 2d 394, 405 (2006) (explaining that "[a] defendant is entitled to a lesser-included offense instruction only if the evidence at trial is such that a jury could rationally find the defendant guilty of the lesser offense, yet acquit him of the greater"). However, irrespective of whether an offense is considered a lesser-included offense, Illinois courts have generally recognized that " '[t]he decision to offer an instruction on a lesser-included offense is one of trial strategy, which has no bearing on the competency of counsel.' " People v. Evans, 369 Ill. App. 3d 366, 383 (2006), quoting People v. Balle, 256 Ill. App. 3d 963, 971 (1993).

In this case, defendant contends, and the State agrees, that based on the charging instrument approach, the offense of criminal damage to property is a lesser-included offense of aggravated arson. We agree with the assessment of both parties.

Pursuant to section 20-1.1(a) of the Criminal Code of 1961 (Criminal Code):

"A person commits aggravated arson when in the course of committing arson he knowingly damages, partially or totally, any building or structure, including any adjacent building or structure, including all or any part of a school building, house trailer, watercraft, motor vehicle, or railroad car, and (1) he knows or reasonably should know that one or more persons are present therein or (2) any person suffers great bodily harm, or permanent disability or disfigurement as a result of the fire or explosion or (3) a fireman or policeman who is present at the scene acting in the line of duty, is injured as a result of the fire or explosion." 720 ILCS 5/20-1.1(a) (West 2002).

In this case, the indictment charged defendant with committing the offense of "aggravated arson in that he, when in the course of committing arson, by means of fire,

26

knowingly damaged real property, to wit: the building located at 2442 West 25th Street, Chicago, Cook County, Illinois and knew or reasonably should have known that one or more persons were present therein, in violation of Chapter 720 Act 5 Section 20-1.1(a)(1) of the Illinois Compiled Statutes 2001, as amended and, contrary to the Statute and against the peace and dignity of the same People of the State of Illinois."

With respect to the offense of criminal damage to property, the Criminal Code provides, in pertinent part, that "[a] person commits an illegal act when he: (a) knowingly damages any property of another without his consent; or (b) recklessly by means of fire or explosive damages property of another; or (c) knowingly starts a fire on the land of another without his consent." 720 ILCS 5/21-1(1) (West 2002).

We conclude that defendant's indictment for the offense of aggravated arson contains a sufficiently broad foundation or main outline for the offense of criminal damage to property. Defendant's indictment charged him with knowingly damaging another's property by starting a fire and thus supports a charge of criminal damage to property under sections 21-1(1)(a) and 21-1(1)(c). See People v. Kyles, 303 Ill. App. 3d 338, 350 (1998) (recognizing that section 21-1(1)(a) "would also be implicated where the property is damaged by fire, although in that subsection that cause of the damage need not be fire related"). Moreover, the indictment provides a sufficient foundation for a charge of criminal damage to property under section 21-1(1)(b) because "the higher mental state of knowledge can be viewed to provide an outline for the mental state of recklessness." People v. Parsons, 284 Ill. App. 3d 1049, 1059 (1996); see also Kyles, 303 Ill. App. 3d at 350 ("Subsection (1)(b) of [the criminal damage to property] statute

27

involves a different mental state, recklessness, [than the aggravated arson statute] but that distinction is not fatal since by definition an included offense may be an offense which requires proof of a less culpable mental state"). Accordingly, we conclude that based on the indictment in this case, criminal damage to property is a lesser-included offense of aggravated arson. See Parsons, 284 Ill. App. 3d at 1058-59 (finding that criminal damage to property was a lesser-included offense of aggravated arson based on an indictment containing similar language); People v. Bradley, 256 Ill. App. 3d 514, 516-17 (1993) (same); see also Kyles, 303 Ill. App. 3d at 349-50 (finding that criminal damage to property was a lesser-included offense of attempted aggravated arson).

Having determined that the indictment in this case contained a sufficient foundation for the offense of criminal damage to property, we must now examine the evidence presented at trial to determine whether the jury could have rationally found defendant guilty of the lesser offense, and if so, whether counsel's failure to request such an instruction caused defendant to receive ineffective assistance of counsel. Defendant contends that his repeated statements that he started a fire in a garbage can located three feet away from a residence provides "more than slight evidence" of reckless conduct and, accordingly, an instruction on the offense of criminal damage to property under section 21-1(1)(b) of the Criminal Code (720 ILCS 5/21-1(1)(b) (West 2002)) was warranted. The State, however, maintains that the jury could not have rationally acquitted defendant of the greater charge of aggravated arson because the evidence overwhelmingly demonstrates that defendant knowingly started the fatal fire.

Both parties rely on People v. Bradley, 256 Ill. App. 3d 514 (1993), to support their

respective arguments as to the existence, or lack thereof, of evidence of recklessness based on defendant's confession. In Bradley, the defendant was charged with aggravated arson based on evidence that she set fire to her boyfriend's mattress. Initially, when asked about the fire, the defendant indicated that she had been smoking and may have dropped a cigarette, thus igniting the mattress. However, upon further questioning, the defendant admitted that she deliberately set her boyfriend's mattress on fire with her cigarette lighter because she was angry with him. On appeal, the defendant challenged her aggravated arson conviction, arguing that the trial court erred in failing to instruct the jury on the lesser-included offense of criminal damage to property. Bradley, 256 Ill. App. 3d at 515-16. We agreed, holding:

> "In the present case, defendant initially offered [police] an explanation of how the fire might have been caused. She stated that she may have dropped and not retrieved a lighted cigarette during a struggle with [her boyfriend]. This statement, although subsequently recanted by defendant, could have supported a determination by the jury that defendant acted recklessly rather than knowingly and deliberately. Defendant's initial statement as to the cause of the fire entitled her to an instruction on criminal damage to property. We hold that the trial court erred in finding that there was no evidence of recklessness and in refusing to give the instruction on criminal damage to property." Bradley, 256 Ill. App. 3d at 516.

Defendant contends that, like the defendant's confession in Bradley, his confession that he ignited a piece of cardboard in a garbage can located three feet away from the residence because he was frustrated by the recent fight he had with his roommate could have supported a

29

finding by the jury that he acted recklessly and, accordingly, he was entitled to an instruction on criminal damage to property. We disagree. As the State correctly notes, when the defendant in Bradley initially admitted to accidentally dropping a lit cigarette, this evidenced a lack of intentional and deliberate action by the defendant. Here, in contrast, the defendant's confession reveals that he started the fire knowingly and deliberately, negating any contention that the fire was caused by mere recklessness. Indeed, unlike the defendant in Bradley, defendant never claimed that the fire was started accidentally; rather, in all of the accounts that defendant provided of the fire, he consistently admitted to deliberately starting a fire in a garbage can, which he positioned close to the residence.

Moreover, the State presented evidence that the defendant actually started the fire by igniting gasoline on the rear wall of the residence, which was clearly a deliberate and knowing act. Specifically, Detective O'Meara and Supervising Fire Marshall Corcoran testified that they encountered a very strong odor of gasoline at the scene of the fire and they were unable to find the remnants of a melted garbage can to corroborate defendant's confession. Moreover, a soil sample taken from the fire scene tested positive for the presence of gasoline and none of the firefighters who responded to the fire saw a burning garbage can when they arrived at the scene. Accordingly, although we find that criminal damage to property was a lesser-included offense to the charged offense of aggravated arson, we find that defendant was not entitled to an instruction on the lesser offense in this case based on his confession. Indeed, even if the jury had believed his confession, there is no basis upon which the jury rationally could have acquitted him of the charged offense of aggravated arson and convicted him of criminal damage to property because

30

there was no evidence that defendant acted recklessly when he admitted to deliberately starting the fire. See Parsons, 284 Ill. App. 3d at 1060 (finding that while the offense of criminal damage to property was a lesser-included offense of aggravated arson, the defendant was not entitled to an instruction on the lesser-included offense because the evidence showed that the defendant intentionally implanted an explosive device in a Chicago bar and thus, "there was no rational basis for acquitting the defendant of the greater offense [of aggravated arson] and for convicting him only of the lesser included offense"); see also Kyles, 303 Ill. App. 3d at 351 (finding that the defendant, charged with attempted aggravated arson, was not entitled to an instruction on the lesser-included offense of criminal damage to property because "[t]here was no evidence of carelessness on the part of the defendant" in starting the fire); People v. Ryan, 97 Ill. App. 3d 1071, 1074 (1981) (holding that the defendant, charged with aggravated arson, was not entitled to an criminal damage to property instruction, because she admitted to intentionally starting fires in an acquaintance's townhouse and, "[a]s such, the record is void of any evidence which establishes mere 'recklessness' "). Accordingly, because defendant was not entitled to an instruction on the lesser-included offense of criminal damage to property, we find that counsel was not ineffective for failing to request such an instruction.

Defendant also contends that trial counsel provided ineffective assistance when he failed to introduce, as substantive evidence, a report completed by state fire investigators concluding that the fire originated in a different location than that determined by Supervising Fire Marshall Corcoran. The State notes that the report is not contained in the record on appeal and thus argues that there is no evidence with which this court can determine whether defense counsel's failure to

31

introduce the report as substantive evidence amounted to ineffective assistance of counsel.

As a general rule, where a defendant's ineffective assistance of counsel claim requires consideration of matters not included in the record on appeal, a postconviction relief proceeding is better suited to resolve that claim and the appellate court may properly decline to adjudicate the defendant's claim on direct appeal. See, e.g., People v. Millsap, 374 Ill. App. 3d 857, 863 (2007) (declining to address the defendant's ineffective assistance of counsel claim on direct appeal because the record did not contain sufficient material to allow for meaningful consideration of the claim); People v. Ligon, 365 Ill. App. 3d 109, 122 (2006) (same).

In this case, although defense counsel referenced the report during his cross-examination of Supervising Fire Marshall Corcoran, the report itself is not contained in the record on appeal. Without reviewing the report, we cannot know the precise conclusions drawn by the state investigators or the evidence that led to those conclusions, and, accordingly, we cannot determine whether defense counsel's failure to introduce the report as substantive evidence deprived defendant of his right to receive effective assistance of counsel. Because this claim of ineffective assistance of counsel requires consideration of matters not contained in the record, we decline to address this argument on direct appeal. Millsap, 374 Ill. App. 3d at 863; Ligon, 365 Ill. App. 3d at 122.

Next, defendant contends that the trial court erred when it refused to instruct the jury on the offense of involuntary manslaughter. The State responds the trial court correctly found that an instruction on the offense of involuntary manslaughter was not warranted because involuntary manslaughter is not a lesser-included offense of felony murder pursuant to the supreme court's

1-06-1940
reasoning in <u>People v. Davis</u>, 213 Ill. 2d 459 (2004).

As we have already outlined above, courts employ the charging instrument approach to determine whether an offense is a lesser-included offense of a charged offense and whether a defendant is entitled to an instruction on that offense. <u>Kolton</u>, 219 Ill. 2d at 360-61; <u>People v. Csaszar</u>, 375 Ill. App. 3d 929, 944 (2007).

In this case, defendant with charged with:

"First Degree [Felony] Murder in that he, without lawful justification killed Samantha Cruz, [Erica Ramos, and Frankie Ramos] while he was committing a forcible felony, to wit: an aggravated arson at 2442 West 25th Street, Chicago, Cook County, Illinois, in violation of Chapter 720, Act 5, Section 9-1(a)(3) of the Illinois Compiled Statutes 2001, as amended, and contrary to the Statute, and against the peace and dignity of the same People of the State of Illinois."

The Criminal Code defines the offense of involuntary manslaughter as follows:

"A person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly, except in cases in which the cause of death consists of driving a motor vehicle or operating a snowmobile, all-terrain vehicle, or watercraft, in which case the person commits reckless homicide." 720 ILCS 5/9-3(a) (West 2002).

Consistent with the statutory definition of felony murder (see 720 ILCS5/9-1(a)(3) (West 2002); <u>Davis</u>, 213 Ill. 2d at 477), defendant's indictment for felony murder does not reference

any mental state with respect to the killing. In contrast, the statutory definition of involuntary manslaughter specifies that a defendant must have had a reckless mental state to be guilty of that offense. 720 ILCS 5/9-3(a) (West 2002). As our supreme court explained in Davis, "for involuntary manslaughter to be a lesser-included offense of felony murder, the felony-murder count must include a more culpable or equally culpable mental state as involuntary manslaughter." Davis, 213 Ill. 2d at 477. Because felony murder, as described in defendant's indictment, does not contain a mental state, and the offense of involuntary manslaughter requires a reckless mental state, we conclude that the charging instrument does not contain a broad outline of involuntary manslaughter. Accordingly, in this case, involuntary manslaughter is not a lesser-included offense of felony murder, and the trial court did not err in refusing to instruct the jury on that offense. See Davis, 213 Ill. 2d at 477 (concluding that involuntary manslaughter was not a lesser-included offense of felony murder in that case because "[f]elony murder as described in defendant's indictment does not include a culpable mental state as to the killing while the offense of involuntary manslaughter does requires a reckless mental state"); see also People v. McCarroll, 168 Ill. App. 3d 1020, 1023 (1988) ("Where the sole murder charge against a defendant is based on felony murder, no involuntary manslaughter charge need be given").

In so holding, we are unpersuaded by defendant's argument that the approach taken by the supreme court in Davis was too narrow because the court "illogically ignored the predicate felony described in the indictment" when it found that involuntary manslaughter was not a lesser-included offense of felony murder based on a simple review of the defendant's indictment for felony murder and the statutory definition of involuntary manslaughter. Specifically, defendant

contends that the <u>Davis</u> court's "analysis ignores a fundamental requirement of every felony murder indictment: the predicate forcible felony. \*\*\* Indeed, because felony murder necessarily requires a predicate forcible felony, any charging instrument analysis of a felony murder indictment necessarily must consider the predicate felony, including its concomitant mental state." We disagree. Defendant's argument ignores the fundamental nature and purpose of the felony murder doctrine. Because "[f]elony murder is premised on strict liability for one who kills or is responsible for a killing during the commission of a felony" (<u>People v. Hall</u>, 291 Ill. App. 3d 411, 420 (1997)), there is no merit to his claim that the mental state of the underlying felony should be examined when a defendant requests an involuntary manslaughter instruction in a felony murder case.

Next, defendant contends that the trial court committed reversible error when it refused to order a mistrial when one of the State's witnesses offered testimony that violated the court's ruling on a motion <u>in</u> <u>limine</u>, precluding reference to prior acts of arson. The State responds that a mistrial was not warranted because defendant was not prejudiced by the testimony.

Generally, testimony pertaining to a defendant's prior unrelated crimes or acts of misconduct to prove the defendant's propensity to commit a crime is prejudicial. See <u>People v. Jackson</u>, 372 Ill. App. 3d 112, 121-22 (2007). However, if evidence of prior crimes is offered in contravention of the trial court's ruling on a motion <u>in</u> <u>limine</u>, such error may generally be cured by sustaining the defendant's objection and instructing the jury to disregard the statement. <u>People v. Hall</u>, 194 Ill. 2d 305, 342 (2000). The violation of a trial court's ruling on a motion <u>in</u> <u>limine</u> is grounds for a mistrial only when the violation effectively deprived the defendant of his

right to a fair trial. Hall, 194 Ill. 2d at 341-42; see also People v. Bishop, 218 Ill. 2d 232, 251 (2006) ("a mistrial should be granted where an error of such gravity has occurred that it has infected the fundamental fairness of the trial, such that continuation of the proceeding would defeat the ends of justice"). Ultimately, because it is within the trial court's sound discretion to grant or deny a party's request for a mistrial, we will uphold the trial court's decision to deny the defendant's motion for a mistrial absent an abuse of discretion. Bishop, 218 Ill. 2d at 251; People v. Nolan, 332 Ill. App. 3d 215, 229 (2002). An abuse of discretion exists only when the trial court's ruling is " 'arbitrary, fanciful, *** or where no reasonable man would take the view adopted by the trial court.' " People v. Melchor, 376 Ill. App. 3d 444, 451 (2007), quoting People v. Santos, 211 Ill. 2d 395, 401 (2004).

In this case, defendant's roommate David Bingenheimer was asked various questions pertaining to the conversation he had with Fire Marshall O'Toole the day after the fire. In pertinent part, Bingenheimer was asked, "And what did you tell him about who started the fire?" Bingenheimer responded, "There's been others in the past." Accordingly, there is no dispute that Bingenheimer's testimony violated the trial court's ruling on defendant's motion in limine precluding the introduction of evidence pertaining to prior acts of arson. However, we cannot conclude that the violation of the motion in limine deprived defendant of his right to a fair trial.

Indeed, following Bingenheimer's response, defense counsel posed an immediate objection, which the trial court immediately sustained. Although the trial court denied defense counsel's request for a mistrial during the sidebar that followed, the trial court did admonish the jury "to disregard that last question and last answer." Moreover, at the conclusion of the trial, the

36

trial court instructed the jurors to disregard questions that were sustained and testimony that was stricken. Accordingly, although an error occurred, we find that the brief mention of other unspecified acts of arson was sufficiently cured by the trial court's subsequent ruling and admonishments to the jury and that the trial court did not abuse its discretion in denying defendant's request for a mistrial. See Hall, 194 Ill. 2d at 342-43 (concluding that the trial court did not abuse its discretion in denying the defendant's request for a mistrial when the State violated its ruling on a motion in limine precluding reference to other crimes because the reference to other crimes was brief and the trial court sustained the defendant's objection, admonished the jury to disregard the question and answer, and instructed the jury at the end of the trial to disregard questions to which an objection was sustained); see also People v. Monroe, 366 Ill. App. 3d 1080, 1092 (2006) (finding that the defendant was not deprived of his right to a fair trial when four witnesses provided testimony concerning prior acts in contravention of the court's ruling on a motion in limine because the trial court sustained objections to the testimony and admonished the jury to disregard the testimony, and thus effectively "cured any prejudice to the defendant").

Defendant next contends that the trial court violated his constitutional right to appear and participate in his trial when it permitted defense counsel to waive defendant's appearance at a conference discussing the appropriate response to a question posed by the jury during its deliberation. The State responds that defendant has forfeited review of this issue because he failed to include this contention of error in a posttrial motion. Alternatively, the State suggests that defendant's lack of presence at the conference discussing the jury's question did not

prejudice him and accordingly, if any error occurred, it was necessarily harmless.

As a general rule, to properly preserve an issue for appellate review, the defendant must make a timely objection at trial and include the error in a written posttrial motion. People v. Enoch, 122 Ill. 2d 176, 186 (1988); People v. Jones, 364 Ill. App. 3d 740, 748 (2006). In this case, there is no dispute that defendant failed to raise this issue in a posttrial motion. However, because claims of error involving judicial misconduct are not generally subject to the same rules of waiver (see People v. Dameron, 196 Ill. 2d 156, 171 (2001); People v. Jennings, 364 Ill. App. 3d 473, 483 (2005)), we will review the merit of this argument.

Defendant asserts that the right to be present "is a personal right which counsel may not waive on his client's behalf" and, accordingly, the trial court erred in accepting trial counsel's waiver of defendant's constitutional right. The State, however, suggests that no error occurred, because the trial court was not required to make a direct inquiry of defendant to accept a waiver of his right to be present.

A criminal defendant has a constitutional right to appear and participate in person and by counsel in all proceedings that impact his substantial rights. U.S. Const., amend. VI; Ill. Const. 1970, art. I, §8; People v. Childs, 159 Ill. 2d 217, 227 (1994). "Jury deliberations are a critical stage of trial which involve substantial rights, triggering the defendant's right to be present and participate in person and by counsel." People v. Ross, 303 Ill. App. 3d 966, 975 (1999). Accordingly, "[a] communication between the judge and the jury following the jury's retiring to deliberate, except one held in open court and in the defendant's presence, deprives the defendant of his constitutional rights." People v. Kliner, 185 Ill. 2d 81, 162 (1998). As with any

38

constitutional right, however, the right to be present can be waived.  People v. Justice, 349 Ill.

App. 3d 981, 987 (2004); People v. Wilson, 257 Ill. App. 3d 670, 678 (1993).  However,

" ' "[w]aivers of constitutional rights not only must be voluntary but must be knowing, intelligent

acts done with sufficient awareness of the relevant circumstances and likely consequences." ' "

People v. Stroud, 208 Ill. 2d 398, 403 (2004), quoting People v. Johnson, 75 Ill. 2d 180, 187

(1979), quoting Brady v. United States, 397 U.S. 742, 748, 25 L. Ed. 2d 747, 756,  90 S. Ct.

1463, 1469, (1970); see also People v. Mallett, 30 Ill. 2d 136, 142 (1964) ("Waiver assumes

knowledge").

Initially, we disagree with defendant that a trial court may only accept a waiver directly

from a defendant.  We rejected this very claim in People v. Wilson, 257 Ill. App. 3d 670 (1993),

noting that there is no "supreme court rule or statute requiring such direct inquiry to defendant

personally, rather than through to his counsel, to establish a waiver of defendant's right to be

present at trial or jury selection."  Wilson, 257 Ill. App. 3d at 680.  Accordingly, we found that

the defendant had waived his right to be present during the voir dire of prospective jurors when

defense counsel, in defendant's presence, informed the court that he had discussed various

options with his client and that defendant had chosen to waive his presence during the voir dire

process.  Wilson, 257 Ill. App. 3d at 679-80.  This same argument was also rejected by the

Fourth District in People v. Justice, 349 Ill. App. 3d 981 (2004).  In that case, the Fourth District

upheld a written "waiver of presence" filed by defense counsel on the defendant's behalf that

waived the defendant's right to be present at the hearing to withdraw his guilty plea, reasoning

that no supreme court rule or statute exists that requires the trial court to personally admonish a

defendant prior to accepting a waiver of presence and that the record revealed that the defendant was aware he had a right to be present and that he had repeatedly informed his counsel he wished to waive that right. Justice, 349 Ill. App. 3d 988. Accordingly, the trial court is permitted to accept a waiver of a defendant's constitutional right to be present from defense counsel. Justice, 349 Ill. App. 3d at 988; Wilson, 257 Ill. App. 3d at 680. However, "[d]efense counsel may waive a defendant's right to be present only if the defendant voluntarily, knowingly, and intelligently waived his right." Justice, 349 Ill. App. 3d at 988.

Therefore, the mere fact that defense counsel waived defendant's right to be present is not itself problematic. What is problematic, however, is that there is no evidence that defendant voluntarily, knowingly, and intelligently waived his right to be present at the conference to discuss the question posed by the jury during its deliberations. Indeed, while the records in Wilson and Justice showed that the defendants were aware of their right to be present and that they voluntarily and knowingly waived their presence, the record in this is case is completely devoid of evidence that defendant was even aware of the jury's question, let alone, that he was aware that he had a right to be present at the conference to discuss the response to that question and chose to waive that right. Rather, the record in this case shows that the trial court simply informed counsel for both parties of the jury's question and asked whether defense counsel waived defendant's presence. Defense counsel simply responded, "Yes," and did not give any indication that he had conferred with his client prior to doing so. Accordingly, based on the record, we find that there is insufficient evidence that defendant voluntarily, knowingly, and intelligently waived his right to be present.

Despite the invalid waiver, the State suggests that no improper ex parte communication occurred because even though defendant was not present in the courtroom at the time the conversation occurred, he was represented by counsel. We disagree.

Our supreme court has recognized that a criminal defendant's right to be present includes the right "to appear and participate *in person and by counsel* at all proceedings that involve his substantial rights." (Emphasis in original.) People v. McDonald, 168 Ill. 2d 420, 459 (1995). A defendant's right to be personally present exists " 'so that he knows what is being done, can make objections and take such action as he deems best to secure his rights and for his protection and defense.' " People v. Thornton, 333 Ill. App. 3d 638, 652 (2002), quoting People v. Harris, 294 Ill. App. 3d 561, 568 (1998). Accordingly, because defendant was not afforded the opportunity to participate in person, we find that an improper ex parte communication occurred. See Thornton, 333 Ill. App. 3d at 652 (finding that trial court engaged in an "erroneous" ex parte communication when it interviewed a juror while the defendant was absent even though the defendant's counsel was present for the communication); see also People v. McLaurin, No. 1-05-1149, slip op. at 11 (May 15, 2008) (finding that the trial court erred when it engaged in an ex parte conversation when the defendant "was not informed or consulted or allowed to be present when the trial court and the attorneys discussed the jury's five notes that were sent to the trial court judge").

Defendant's absence alone, however, does not provide us with cause to reverse his conviction because:

" 'Even where a defendant has the general right to be present because the proceeding is a

> "critical" stage, a defendant's absence is not a per se constitutional violation. Rather, a
>
> defendant's absence from such a proceeding will violate his constitutional rights only if
>
> the record demonstrates that defendant's absence caused the proceeding to be unfair or if
>
> his absence resulted in a denial of an underlying substantial right.' " Stroud, 208 Ill. 2d at
>
> 405, quoting People v. Lindsey, 201 Ill. 2d 45, 57 (2002).

Accordingly, where it is apparent that an improper ex parte communication did not prejudice the defendant, we will not set aside the jury's verdict. McDonald, 168 Ill. 2d at 460; People v. Thornton, 333 Ill. App. 3d 638, 653 (2002). It is the State's burden, however, to prove that the improper communication was harmless and did not prejudice the defendant. Kliner, 185 Ill. 2d at 162; McDonald, 168 Ill. 2d at 460.

The State contends that defendant was not prejudiced by the conversation because the trial court agreed to provide the additional definition of the term "knowingly" that defense counsel requested. Defendant, however, suggests that he was prejudiced because "complete definitions of both knowingly and reckless mental states would have been appropriate responses to the jury's questions."

In this case, we cannot conclude that defendant's absence prejudiced him. The jury's question centered on the term "knowingly." Specifically, the jury inquired: "This is our question: Knowingly damage, partially or totally any building, is knowingly meant to be one, having knowledge of, two, or with intent. Or, to dispute unknowingly." While the State suggested that "the language of knowledge is pretty plain," defense counsel requested the court to provide the jurors with Illinois Pattern Jury Instruction, Criminal, No. 5.01B (4th ed. 2000)

1-06-1940
5.01B, subparagraph 2, which provides that: " 'Person acts knowingly with regard to the result of his conduct when he is consciously aware that such result is practically certain to be caused by his conduct.' " The trial court agreed with defense counsel's suggestion and provided the additional instruction to the jury. We do not agree that defense counsel should have also requested that the court provide an instruction on the mental state of recklessness. Namely, an instruction of a reckless mental state would have been unresponsive to the jury's question seeking additional explanation for the term "knowingly." Moreover, an instruction on recklessness would have been inappropriate given the complete lack of evidence that defendant acted recklessly when he ignited the fire. Accordingly, although an improper ex parte conversation occurred, we conclude that the communication did not prejudice defendant; rather, it was harmless beyond a reasonable doubt.

In so finding, we are unpersuaded by defendant's reliance on our recent decision in People v. McLaurin, No. 1-05-1149 (May 15, 2008). In McLaurin, the defendant appealed his weapons convictions seeking reversal on the grounds that the trial court violated his constitutional right to be present when it excluded him from discussions pertaining to five notes sent by the deadlocked jury during jury deliberations and permitted the sheriff to have an ex parte conversation with the jurors. We agreed that the defendant's constitutional rights were violated and reversed his conviction due to the fact that "[t]he *cumulative effect* of the trial court's violations of [the defendant's] constitutional rights was so serious that it affected the fairness of his trial." (Emphasis added.) McLaurin, slip op at 14. The facts in McLaurin are thus readily distinguishable from those present in the case at bar, where there was one meeting conducted in

43

open court discussing a single question posed by the jury, and the trial court responded to the jury's question in the precise manner requested by defense counsel. Moreover, unlike McLaurin, because the ex parte communication occurred in open court and there is a record of what transpired, we are able to conclude beyond a reasonable doubt that communication did not prejudice defendant. See McLaurin, slip op. at 16 (declining to speculate on the effects of the sheriff's ex parte communication with the jurors in the jury deliberation room). Accordingly, we reject defendant's claim that the trial court's violation of his constitutional right to be present compels reversal in this case.

Finally, defendant contends, and the State concedes, that his conviction for aggravated arson and the 30-year sentence imposed thereon must be vacated because it was the lesser-included predicate offense for his felony murder conviction.

"[M]ultiple convictions are improper if they are based on lesser included offenses." People v. Smith, 183 Ill. 2d 425, 431-32 (1998), citing People v. Rodriguez, 169 Ill. 2d 183, 186 (1996). It is thus improper for a criminal defendant to receive a separate conviction and sentence for the felony that served as the predicate offense to felony murder. See Smith, 183 Ill. 2d at 432 (vacating the defendant's conviction and sentence for armed robbery, the predicate offense underlying the felony murder charge); Washington, 272 Ill. App. 3d at 919 (vacating the defendant's conviction and sentence for aggravated arson, because "the prosecution here based the felony murder charge on aggravated arson").

In this case, aggravated arson was the offense underlying the felony murder charge. Accordingly, defendant's conviction and sentence for aggravated arson cannot stand. Smith, 183

44

1-06-1940

Ill. 2d at 432; <u>Washington</u>, 272 Ill. App. 3d at 919.  We thus vacate defendant's aggravated arson conviction and the sentence imposed thereon.

For the foregoing reasons, we affirm defendant's conviction and sentence for felony murder and vacate defendant's conviction and sentence for aggravated arson.

Affirmed in part and vacated in part.

QUINN, P.J., and THEIS, J., concur.